**RED RIVER SERVICE CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 03–2747C.

United States Court of Federal Claims.

April 30, 2004.

Jonathan M. Bailey, Bailey & Bailey, P.C., San Antonio, Texas, for plaintiff.

Delfa Castillo, United States Department of Justice, Washington, D.C., for defendant.

Major Brent G. Curtis and Wilbert W. Edgerton, United States Air Force counsel.

Beverley Hazlewood Lewis, United States Small Business Administration counsel.

## MEMORANDUM OPINION AND FINAL JUDGMENT

BRADEN, Judge.

This bid protest case, filed by Red River Service Corporation of Los Fresno, Texas ("Red River"), presents two important jurisdictional issues:

Whether the Tucker Act, 28 U.S.C. § 1491 ("Tucker Act"), authorizes the court to review a decision of an Administrative Judge in

---

the Small Business Administration ("SBA") Office of Hearings and Appeals; and

Whether the "substantial chance" standing test is applicable in a pre-award context.

For the reasons discussed herein, both questions are resolved in the negative. The court has exercised its jurisdiction solely to set aside the Department of the Air Force ("Air Force") Solicitation at issue until compliance with the governing procurement regulations regarding the selection of a North American Industry Classification System ("NAICS") code is achieved.

## RELEVANT FACTS [1] AND PROCEDURAL BACKGROUND

### A. Department Of Air Force Solicitation FA8773–04–R–0001.

The Contracting Office for the 38th Engineering Installation Group ("EIG") is responsible for the operation of the Base Telecommunications System ("BTS") at 39 Air Force bases throughout the country. On October 15, 2003, the Contracting Officer for Tinker Air Force Base in Oklahoma, a member of the 38th EIG ("Air Force CO"), issued Solicitation FA8773–04–R–0001 ("the Solicitation") to procure "monthly Operations and Maintenance (O & M) services in support of the BTS [2] and infrastructure (and Switchboard Operations if required)." AR at 133. The BTS consists of "the base switching system, the fiber optic or copper distribution systems on premise[,] and all associated equipment[.]" *Id.* These services are to be provided at four Air Force bases ("AFBs"): Grissom AFB in Indiana; Los Angeles AFB in California; Seymour–Johnson AFB in North Carolina; and Whiteman AFB in Missouri. *See* AR at 2–586.

The Air Force CO for this Solicitation selected NAICS Code 811212, "Computer and Office Machine Repair and Mainte-

---

1. Neither party has requested that the record or briefs filed in this case be placed under seal. The relevant facts recited herein are summarized from documents found in the December 23, 2003 Administrative Record ("AR") and Supplemental AR. *See* AR at 1–790 (record from Air Force); AR at 791–1596 (record from the SBA Office of Hearings and Appeals).

2. The BTS is defined in the Solicitation's glossary of terms as: "A system to provide total telephone service, to include the telephone switch, remote switching equipment, BDS, premise equipment, reserve power equipment, and other necessary ancillary equipment." AR at 186.

nance." *See* AR at 3.[3] In order to qualify as a small business within the NAICS Code 811212 category, a firm may not have more than annual receipts of $21 million. *Id.*

On October 20, 2003, shortly after Red River received and reviewed the October 15, 2003 Solicitation, Red River contacted the Chief of the Contracting Division and Small Business Specialist for the 38th EIG at Tinker Air Force Base to request that office to intervene and direct the Air Force CO to change the NAICS Code from 811212 "Computer and Office Machine Repair and Maintenance," with a size standard of $21 million, to NAICS Code 517110 "Wired Telecommunications Carriers," with a size standard of 1,500 employees. See AR at 775, 787–89. On October 24, 2003, the Air Force CO was requested by the Chief of the Contracting Division and Small Business Specialist to make this change, but the CO declined. *See* AR at 788, 820.

## B. Proceedings Before The SBA Office Of Hearings And Appeals.

On October 24, 2003, Red River filed an Appeal Petition to the SBA Office of Hearings and Appeals ("OHA") challenging the CO's designation of NAICS Code 811212. *See* AR at 772–74. Red River advised that Office that "the Air Force currently uses NAICS 517110 for other BTS programs to include Tinker Air Force Base," and "all similar telecommunications services for the U.S. Army are procured under NAICS Code 517110 at the 1,500 employee level," instead of NAICS Code 811212, with a size standard of $21 million. *See* AR at 772. In addition, on October 28, 2003, Red River proffered an August 23, 2001 Small Business Administration Decision, Docket Number NAICS–2001–08–09–31, where, in a similar procurement, the agency upheld the use of NAICS Code 513310, "Wired Telecommunications Carriers." *See* AR at 764.

On November 5, 2003, the CO submitted a response to the SBA Office of Hearings and Appeals defending the selection of NAICS Code 811212 for Solicitation FA8773–04–R–001:

> The NAICS/SIC codes of 517110/4813, 513390/4899 are considered to fall under business industries classified as utilities; whereas, 811212/7378 and 561421/7389 are considered to fall under services. Operations and Maintenance of the base telecommunications switch (BTS) falls under services. Our O & M contracts use NAICS 811212 (SIC 7378) *because a BTS is basically computer equipment.* All data flows through computer networking. All preventive maintenance is performed through use of a computer. The programming identifies all parts and components that are tied into the switch. If there is a failure with the switch, it is identified through computer printout. All software upgrades to the switch are performed through the computer.

AR at 594, 598 (emphasis added).

\* \* \* \* \* \*

> Since 1990 this office has awarded in excess of 50 contracts under SIC 7378, with no challenge to the SIC Code being used. This office currently has 39 active contracts awarded under SIC 7378, or NAICS811212, in place (which Red River Services Corporation holds five (5)). Since 1999 this office has awarded two 8(a) competitive and three sole source 8(a) contracts using NAICS 811212. The letter of acceptance from the Small Business Administration took no exception to usage of NAICS 811212 for our O & M contracts. Further, this office has received guidance from the Small Business Administration Office and the U.S. Census Bureau con-

---

3. The Office of Management and Budget is responsible for assigning NAICS codes to various industry sectors. The SBA then determines which firms qualify as "small businesses" to assure, among other policy objectives, that a fair proportion of government contracts for goods and services are performed by such entities in each industry category. *See* 15 U.S.C. § 637(b)(6); 15 U.S.C. § 644(a). To accomplish this, SBA specifies the maximum number of employees or maximum annual receipts that qualify a small business within an individual NAICS code. *See* 13 C.F.R. § 121.201. The relevant contracting officer, however, is responsible for selecting the appropriate NAICS code, as well as the services to be procured. *See* 13 C.F.R. § 121.101; 48 C.F.R. § 19.102; 48 C.F.R. § 19.303(a).

firming that 811212 was the appropriate code to use.

AR at 603.

On November 13, 2003, an Administrative Judge in the SBA Office of Hearings and Appeals issued a decision determining that "NAICS code 811212 is appropriate for the instant procurement because the services required by the SOW are best described by that classification in the NAICS manual." AR at 587, 592. Moreover, the Administrative Judge held that Red River did not meet its burden to establish by a preponderance of the evidence that the CO's designation of NAICS Code 811212 was based on clear error of fact or law. *See* AR at 590–592 (citing 13 C.F.R. § 134.314; *SIC Appeal of Four Winds Services, Inc.*, SBA No. SIC–4407 (2000)).

### C. Proceedings Before The United States Court Of Federal Claims.

On November 25, 2003, Red River filed a timely complaint in the United States Court of Federal Claims under the Tucker Act alleging "a violation of statute or regulation in connection with a procurement." Compl. ¶ 1. The principal remedy sought is "preliminary injunctive relief to enjoin the [Air Force] from proceeding with receiving proposals pending final resolution of this matter," Compl. ¶ 25, and declaratory relief "providing that the proper NAICS code for this procurement is NAICS 517110." Compl. ¶ 9 (Prayer for Relief). Attached to the complaint is Exhibit 1, a November 21, 2003 Affidavit of Mr. Ellis A. Bryant, Telecommunications Program Manager for Red River, together with 26 pages of materials, including Mr. Bryant's resume and a series of letters of accommodation regarding Mr. Bryant's past service on various military service contracts ("Bryant Aff."). On November 25, 2003, Red River also filed a Motion for a Preliminary Injunction. On December 3,

2003, the Administrative Record was filed, supplemented on December 11, 2003, and corrected on December 23, 2003.[4]

A telephone status conference was convened by the court on December 8, 2003. At that time, the Air Force agreed to delay awarding a contract regarding Solicitation No. FA8773–04–R–001 until this case was resolved; in return, Red River agreed to withdraw its Motion for Preliminary Injunction.

On December 17, 2003, the defendant ("Government") filed a Motion to Strike Exhibit 1 on the grounds that it was not part of the Administrative Record. On January 6, 2004, Red River's Motion for Judgment on the Administrative Record, together with a Memorandum in Support and Statement of Facts ("Pl.Mot.J") was filed. On January 16, 2004, Red River's Response to the Government's Motion to Strike was filed. On January 20, 2004, the Government filed an Opposition to Red River's Motion for Summary Judgment and Cross–Motion for Judgment on the Administrative Record ("Gov't Opp."). On January 21, 2004, the Government filed a Statement of Facts and Counter Statement of Facts. On January 23, 2004, the Government's Reply in Support of its Motion to Strike was filed. On January 27, 2004, Red River filed a Rebuttal to the Government's Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record ("Pl.Reply").

A second telephone status conference was convened on January 29, 2004, at which time the court denied the Government's Motion to Strike Exhibit 1, but granted the Government leave to supplement the record in rebuttal, as requested. On February 9, 2004, the Government submitted a February 6, 2004 Declaration of CO Mary C. Hampton with Exhibits A–C ("Hampton Decl.") and a February 2, 2004 Declaration of Chuong D.

---

4. The Administrative Record is "not a documentary record maintained contemporaneously with the events or actions included in it. Rather, the administrative record is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." *Tech Systems, Inc. v. United States*, 50 Fed.Cl. 216, 223 (2001); *see also Guam Indus. Services, Inc. v.*

*United States*, No. 03–706, at 3 (Fed.Cl. June 9, 2003) ("[T]he Administrative Record consists of the RFP and little more. The other material in the Administrative Record consists of background information and legal materials such as legislative and regulatory history commonly accepted in the adjudication of ordinary motions of summary judgment.").

Nguyen, Chief, CSA/O & M Branch ("Nguyen Decl.").

On February 9, 2004, at the request of the parties, a hearing was held on the pending dispositive motions in a federal courthouse in San Antonio, Texas. On that occasion, counsel for both parties submitted numerous demonstrative exhibits that were admitted by leave of the court. *See* TR at 50. Following the hearing, at the request of the court, the parties attempted in good faith to reach an amicable settlement of this case. During a March 11, 2004 telephone conference, the court was advised by counsel for the Government that the circumstances had changed since the February 9, 2004 hearing, in that the financial stability of the current provider for the services that would be subject to Solicitation FA8773–04–R–001 was at issue and certain potential offerors for Solicitation FA8773–04–R–001 apparently were considering raising the price of their services for this negotiated contract. Consequently, the Government would like to consider Red River's potential offer, but apparently is unable to ascertain how to accomplish that without the court's determination of the issues presented by this case. On March 24, 2004, Red River filed a Post Hearing Brief. In addition, on March 25, 2004, Red River submitted a supplemental February 9, 2004 Declaration of Mr. Bryant ("Bryant Decl."). On March 29, 2004, the Government filed a Post Oral Argument Brief.

## DISCUSSION

**A. The United States Court Of Federal Claims Does Not Have Jurisdiction Under The Tucker Act To Review A Decision Of An Administrative Judge Of The Small Business Administration Office Of Hearings And Appeals.**

**1. The Jurisdiction Of The Small Business Administration Office Of Hearings And Appeals.**

The SBA is responsible for establishing the "size standards" for NAICS code categories considering the "economic characteristics comprising the structure of an industry[.]" 13 C.F.R. § 121.102(a). The "size standards are . . . expressed either in number of employees or annual receipts in millions of dollars[.]" 13 C.F.R. § 121.201. The SBA, however, does not select the NAICS code for a solicitation, since that is the responsibility of the "procuring agency contracting officer[.]" 13 C.F.R. § 121.402(b). In making this designation, the Contracting Officer selects:

the NAICS code which *best describes the principal purpose* of the product or service being acquired. Primary consideration is given to the industry descriptions in the NAICS United States Manual, the product or service *description in the solicitation* and any attachments to it, the *relative value and importance of the* components of the procurement making up the end item being procured, and the function of the goods or services being purchased. Other factors considered include previous Government procurement classifications of the same or similar product or services, and the classification which would best serve the purposes of the Small Business Act. A procurement is usually classified according to the component, which accounts for the greatest percentage of contract value.

*Id.* (emphasis added).

The NAICS code assigned to a procurement and its corresponding "size standard" is final, unless timely appealed to the SBA's Office of Hearings and Appeals. *See* 13 C.F.R. § 121.402(c). This is "an administrative remedy that must be exhausted before *judicial review . . . may be sought in a court.*" 13 C.F.R. § 121.1102 (emphasis added). The standard of review before the SBA Office of Hearings and Appeals is whether the size determination or NAICS code designation was based on clear error. *See* 13 C.F.R. § 134.314. The decision of an Administrative Judge in that Office is final and effective upon issuance. *See* 13 C.F.R. § 134.316.

**2. The Jurisdiction Of The United States Court Of Federal Claims Under The Tucker Act.**

■ Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act 1996, Pub.L. No. 104–320 § 12,

110 Stat. 3870, 3874–75 (1996), the United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party *objecting to a solicitation by a Federal agency* for bids or proposals for a proposed contract or to a proposed award ... or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (emphasis added).

In this case, Red River asserts that the court has jurisdiction to review the November 13, 2003 decision of the Administrative Judge in the SBA's Office of Hearings and Appeals. See Pl. Mot. J. at 14 (citing *Ceres Envtl. Services, Inc. v. United States*, 52 Fed.Cl. 23, 33 (2002)). Interestingly, the Government did not address the court's jurisdiction at all, but instead launched into a detailed discussion of the proceedings before the Administrative Judge, concluding that:

> SBA OHA's decision in this matter was reasonably based upon a review of the full administrative record, consideration of the central purpose of the procurement and applicable law, and was adequately explained. As the decision had a rational basis, it was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Because the SBA has been designated by Congress as the arbiter of small business matters, the decision also warrants deference. *Three S Constructors [v. United States,]* 13 Cl.Ct. [41,] 46 [(1987).] Accordingly, the court should affirm the decision, even if a different result could be reached (*id.* at 45), and enter judgment in favor of the United States.

Gov't Opp. at 24–25.

The United States Court of Appeals for the Federal Circuit in *Cavalier Clothes, Inc. v. United States*, 810 F.2d 1108 (Fed.Cir. 1987) reversed an oral ruling of the United States Claims Court (predecessor of the Court of Federal Claims) holding that the court did not have jurisdiction to enjoin a decision of the SBA regarding the issuance of a Certificate of Competency, since the contracting officer was "divested of further discretion" once the SBA acted. *Id.* at 1110; *see also Speco Corp. v. United States*, 2 Cl.Ct. 335, 337 (1983) (Mayer, J.) (citing 15 U.S.C. § 634(b)) (the SBA may only "be sued in ... United States district court, and jurisdiction is conferred upon such district court to determine such controversies ...; but no attachment, injunction, garnishment, or other similar process ... shall be issued against the [SBA] Administrator or his property[.]"). In *Cavalier Clothes*, however, the Federal Circuit only rejected the holding in *Speco* "to the extent that [the United States Court of Federal Claims] deems the SBA's denial of a COC as final and unreviewable." *Cavalier Clothes*, 810 F.2d at 1110. Although the SBA's decision may be a "final disposition," the Federal Circuit ruled that the SBA was not immunized from judicial review and, in any event, so long as the contract award had not been made, a Contracting Officer "in receipt of new information" may reconsider, withdraw the referral to the SBA, and make the award to a previously rejected bidder. *Id.* at 1111.

The decision in *Cavalier Clothes*, however, completely begs the question of *what court* has jurisdiction to review SBA decisions. The Federal Circuit simply concluded that in light of the Federal Courts Improvement Act of 1982, which provided the United States Claims Court, and ultimately the United States Court of Federal Claims, with injunctive relief prior to the award of a contract, "there is no basis for any inference that Congress intended to exclude the SBA when it later authorized injunctive relief against agencies and departments generally on pre-award contract claims." *Id.* at 1112. Jurisdiction, however, cannot be conveyed by congressional inference or silence.

The vitality of *Cavalier Clothes* is ripe for reconsideration and clarification in the event the Federal Circuit is requested to consider this case on appeal.[5] The court can find no

---

5. No panel of the Federal Circuit has cited the *Cavalier Clothes* decision since it was issued in 1987. Nevertheless, this case has spawned a series of opinions in the United States Court of Federal Claims, none of which were appealed, asserting jurisdiction over final SBA decisions. See, e.g., *Ceres Envtl. Services, Inc. v. United States*, 52 Fed.Cl. 23, 33 (2002) ("Although these principles [APA standard of review] are derived from cases evaluating the actions of contracting

statutory authority that provides the court with jurisdiction to review final decisions of the SBA, unless the agency is party to a contract or solicitation at issue. *See* Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.* The proper forum for further adjudication of SBA administrative decisions clearly lies with a United States District Court. *See* 15 U.S.C. § 634(b); *see also DSE, Inc. v. United States,* 169 F.3d 21, 27–28 (D.C.Cir.1999) (holding that the district court's APA review of a SBA size decision was not entitled to deference, but that the agency's interpretation and application of its own regulations did merit deference); *McCarty Corp. v. Rice,* 1989 WL 165904, at *11 (D.D.C.1989) (granting injunction pending adjudication of whether a SBA "size determination is 'arbitrary, capricious, and in violation of the SBA's own regulations.'"). On the other hand, the court has found no statutory authority that immunizes a Contracting Officer's NAICS Code selection from review under the Tucker Act, utilizing the APA standard of review.

Accordingly, the court will exercise its Tucker Act jurisdiction in this case solely to review the Air Force CO's selection of NAICS Code 811212 regarding Solicitation FA8773–04–R–0001. In doing so, the court actions are consistent with congressional rationale for amending the Tucker Act to extend bid protest jurisdiction based on an implied-in-fact contract, which in this case is with the Air Force, not the SBA.

**B. Red River Has Standing In This Case.**

**1. The "Substantial Chance" Standing Test Should Not Apply In A Pre–Award Bid Protest.**

■ The United States Court of Appeals for the Federal Circuit in bid protest cases requires that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003); *see also National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1053 (D.C.Cir.1989) ("Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system."). To establish prejudice, a plaintiff must show that "absent the error, 'there was a substantial chance it would have received the contract award.'" *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001) (quoting *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999)); *see also Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a *substantial chance* that [it] would receive an award—that it was within the zone of active consideration.") (citations omitted). All of these cases, however, address standing in a post-award context. *See also Guilford Gravure, Inc. v. United States,* 365 F.3d 1345, 1351, 2004 WL 876057, at *4 (Fed.Cir.2004) (post-award bid case); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1334 (Fed.Cir.2001) (same); *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (same); *C.A.C.I., Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (same).

Although the United States Court of Appeals for the Federal Circuit has not explicitly addressed the standard of review for a plaintiff's standing in a pre-award context,

---

officers, the same standards apply when evaluating the SBA's determination of whether a solicitation contains the proper NAICS code."); *Stapp Towing, Inc. v. United States,* 34 Fed.Cl. 300, 306 (1995) ("Unquestionably, the Court of Federal Claims has jurisdiction to review the COC [SBA's Certificate of Competency Program] determination. *Cavalier Clothes, Inc. v. United States,* 810 F.2d 1108, 1110–12 (Fed.Cir.1987)"); *C & G Excavating, Inc. v. United States,* 32 Fed.Cl. 231, 241 n. 9 (1994) ("Although the [SBA] Act commits the final disposition of COC review to the SBA, this does not preclude judicial review [by

the United States Court of Federal Claims] of a decision not to grant a COC. *Cavalier Clothes,* 810 F.2d at 1111."); *Three S Constructors v. United States,* 13 Cl.Ct. 41, 45 (1987) ("Thus, pre-award implied-in-fact contract claim jurisdiction under 28 U.S.C. § 1491(a)(1) exists in the Claims Court to review the SBA matter as it relates to the contractual requirements for fair and honest governmental consideration of plaintiff's solicited bid.") (citations omitted other than *Cavalier Clothes, Inc. v. United States,* 810 F.2d 1108 (Fed.Cir.1987)).

the court is persuaded that a plaintiff would not be required to establish that, but for the alleged error, "there was a substantial chance it would have received the contract award[.]" *Alfa Laval,* 175 F.3d at 1367. At the pre-award juncture, a plaintiff usually will not know who the other offerors are and may not know their *bona fides.* Indeed, if the plaintiff had knowledge of these facts, certainly a factual question of how that information was ascertained would raise an issue under the Sherman Act, 15 U.S.C. §§ 1 and perhaps the Procurement Integrity Act, 41 U.S.C. §§ 401–36, as well. Without at least some of this information, however, a plaintiff would have no idea whether its offer would be within the "zone of active consideration." *Statistica,* 102 F.3d at 1581. Of course, a rule could be fashioned that would require a plaintiff to have prior comparable industry experience or experience as a government contractor, but such a rule would preclude a new entrant from being able to assert a bid protest.

For these reasons, the court declines to require the plaintiff in this case to satisfy the "substantial chance" standing test pre-award, but rather will rely on the "interested party" test until the United States Court of Appeals for the Federal Circuit directs otherwise.[6]

## 2. Red River Has Established That It Is An "Interested Party" In This Case.

■ As a threshold matter, the Tucker Act specifically requires that a plaintiff must establish standing by being "an interested party." 28 U.S.C. § 1491(b)(1); *cf.* 31 U.S.C. § 3551(2) (for purposes of review by the GAO an "interested party [is] an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."). A two-part test has been used to determine "interested party" status: 1) the protestor must show a connection to the procurement; and 2) the protestor must have an economic interest in the procurement. *See American Fed'n Gov't Employees, AFL–CIO v. United States,* 258 F.3d

6. In this case, none of Red River's pleadings or arguments asserted that Red River would receive the award, if the court found the CO's designation of NAICS Code 811212 to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] without observance of procedure required by law[.]" 5 U.S.C. § 706. The Government also never challenged Red River's standing, either in its briefs or at the hearing, where the court attempted to ascertain some factual information relevant to Red River's standing under the "substantial chance" test:

> THE COURT: How many companies are going to—that you know of are planning to compete for this business?
> MS. CASTILLO: I don't think that we have any way of knowing, because the solicitation due date was extended. Let me just check, just to make sure on that.
> THE COURT: Sure.
> (Pause.) ...
> MS. CASTILLO: Sixteen.
> THE COURT:—16 companies that are presently—you anticipate will be submitting bids under the classification that you've chosen.
> MS. CASTILLO: That appears to be correct.
> THE COURT: Including the current—I don't want to say vendor, but who[m]ever you're using right now, the current contractor.
> MS. CASTILLO: That I don't know. Let me just check.
> MS. HAMPTON: At the bases, only if the incumbent contractor is currently a small business.

> THE COURT: And it was my understanding the current contractor is a small business and will be bidding.
> MS. HAMPTON: I believe at one of the bases, there is a large business there that will not be bidding. One of the bases has General Dynamics there. They are a large business. They cannot bid on the reprocurement.
> TR at 52–53.

> * * * * * *

> MR. BAILEY: As far as whether the 16 offerors that attended the site visit, whether they would be excluded, the size standard in this procurement is 21 million average annual revenue. If you have 1,500 employees, I don't see how—you couldn't have—to fit under 21 million, you couldn't have more than 1,500 employees, because unless your—the payroll on 1,500 employees would be at least 21 million, about 20 grand per employee loaded times at least—and these are highly technical skills, so they're highly paid people; they make [$]15, $18 an hour. There is absolutely no way that if you fit under 21 million a year, you could have more than 1,500 employees. I mean, just simple math.
> THE COURT: That's a different issue.
> MR. BAILEY: Right. But it is impossible for us to know right now whether those other companies, but we would be—as a mathematical basis, I'd be highly surprised that a company could have less than 21 million in gross revenue but have more than 1,500 employees. They'd have to be pretty low-paid people.
> TR at 114–15.

1294, 1302 (Fed.Cir.2001) ("We hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."); *see also Guilford Gravure*, 365 F.3d at 1352, 2004 WL 876057, at *5 (restating that the Federal Circuit construes the term "interested party" in accordance with [Competition in Contracting Act, 31 U.S.C. § 3551] definition and that standing under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

■ In this case, the Solicitation states that the "estimated contract value of the minimum base is more or less than $1.5 million over 7 years. . . . The maximum value for the four contracts awarded as a result of this solicitation is estimated at $48 million ($12 million each)." AR at 3. Red River has established that it is a protestor with the intent of submitting an offer in response to the Solicitation and that it has a direct economic interest in being awarded this contract, based on the dollar amount at issue, and the fact that a new contract for these services may not be solicited for another seven years. *See* Compl. ¶ 25 ("a decision of the [Air Force] to proceed with receipt of proposals prior to the resolution of this matter could effectively exclude [Red River] from competition entirely.").

Accordingly, Red River has established that it is an "interested party" with standing to pursue this pre-award protest under the Tucker Act.

## C. Standard Of Review.

### 1. In Bid Protest Cases.

Bid protest actions are reviewed under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.,* which provides:

The reviewing court shall—. . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—. . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (D) without observance of procedure required by law[.]

5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4); *see also Impresa*, 238 F.3d at 1332 (holding that a bid award may be set aside if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.").

In this case, the court must ascertain whether the Air Force CO's selection of NAICS Code 811212 lacks a "rational basis," *i.e.,* whether "the contracting agency provided a coherent and reasonable explanation for its exercise of discretion." *Impresa*, 238 F.3d at 1332–33; *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *Grumman Data Systems Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994) (recognizing that "Government agencies are entrusted with a good deal of discretion in making procurement decisions.").

In the alternative, to prevail on a challenge that the procurement involved a violation of regulation or procedure, the plaintiff must "show a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333 (quoting *Kentron Hawaii Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir. 1973)); *see also Guilford Gravure*, 365 F.3d 1345, 1353, 2004 WL 876057, at *6 (Fed.Cir. 2004).

### 2. On Supplementation Of The Administrative Record.

As a general rule, a court reviewing an agency decision under the APA standard "should be [limited to] the administrative record already in existence, not some new record made initially by the reviewing court."

*Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). For this reason, courts are extraordinarily skeptical about post-decision agency rationalizations. *See Citizens to Preserve Overton Park,* 401 U.S. at 419, 91 S.Ct. 814 ("These affidavits were merely *'post hoc'* rationalizations, which have traditionally been found to be an inadequate basis for review. And they clearly do not constitute the 'whole record' compiled by the agency: the basis for review required by § 706 of the Administrative Procedure Act.") (internal citations omitted).

The United States Court of Appeals for the Federal Circuit has not addressed the circumstances under which the administrative record may be supplemented. The United States Court of Appeals for the D.C. Circuit, however, has allowed the administrative record to be supplemented in the following situations:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir. 1989) (quotations omitted).

Both parties have moved the court to supplement the Administrative Record. For the reasons discussed herein, the court does not consider any of this supplemental information to be dispositive of the legal issues in this case. Nevertheless, the court believes the interests of justice are best served with a full record. Therefore, the court grants leave to supplement the record to include: the November 21, 2003 Affidavit of Mr. Bryant, with exhibits; the February 6, 2004 Declaration of CO Hampton with Exhibits and the February 2, 2004 Declaration of Mr. Nguyen; and the February 9, 2004 Declaration of Mr. Bryant.

### 3. For A Permanent Injunction.

Injunctive relief is an extraordinary remedy. *See C.A.C.I., Inc.—Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983). The standard for a permanent injunction requires the plaintiff to show: success on the merits; there will be irreparable harm if an injunction is not granted; the balance of hardships favors the plaintiff; and granting the injunction serves the public interest. *See Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.,* 74 F.3d 1216, 1219 (Fed.Cir.1996); *see also FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993) (holding that no one factor is determinative, and "the weakness of one factor may be overborne by the strength of the others."). The party seeking an injunction bears the burden of proving entitlement to relief, central to which are success on the merits and irreparable harm. *See Sofamor Danek,* 74 F.3d at 1219 (citing *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555–56 (Fed.Cir.1994)).

### D. Resolution Of Pending Motions For Judgment On The Administrative Record.

As a matter of law, the court is satisfied that the requirements of the first part of the *Impresa* decision were met by the Air Force CO who provided a rational justification for the decision to select NAICS Code 811212 "Computer and Office Machine Repair and Maintenance." *See* AR at 594–605; *see also* Gov't Opp. at 12–21. The "procurement procedure, [however,] involved a violation of regulation[s.]" *Impresa,* 238 F.3d at 1332.

### 1. Red River Has Established That The Air Force CO Violated Governing Procurement Regulations.

#### a. NAICS Code 811212 Does Not "Best Describ[e] The Principal Nature Of The ... Service Being Acquired" For Air Force Solicitation FA8773–04–R–0001.

 The FAR regulations governing small business size under the Armed Services Pro-

curement Act, 10 U.S.C. §§ 2302, *et seq.,* require "[c]lassifying the product or service being acquired in the industry whose definition, as found in the [NAICS] Manual ... *best describes* the principal nature of the product or service being acquired[.]" 48 C.F.R. § 19.102(b)(1) (emphasis added); *see also* 13 C.F.R. § 121.402(b).[7]

Solicitation FA8773–04–R–0001 was issued to procure "monthly Operations and Maintenance (O & M) services in support of the BTS [*i.e.,* the base switching system, the fiber optic or copper distribution systems on the premises and all associated equipment (*see* AR at 133) ] and infrastructure (and Switchboard Operations if required)." AR at 3; *see also* AR at 186 (the BTS is defined in the Solicitation glossary as: "A system to provide *total telephone service,* to include the telephone switch, remote switching equipment, BDS,[8] premise equipment, reserve power equipment, and other necessary ancillary equipment.") (emphasis added).

The Solicitation's Equipment Performance Specifications describe the technical requirements for the:

> Base Telecommunications System (BTS) that will provide equipment and transmission media to support base telecommunications. The major groups of equipment that comprise the BTS are switching systems, switch associated and ancillary equipment, outside and inside cable plant, ancillary equipment, and premise equipment.

AR at 213.

The Solicitation's "Performance System Maintenance" section states that the "Contractor shall operate and maintain the switching system identified in Appendix 5.2 IAW of the OE manuals[.]"[9] AR at 135. In addition, the Contractor is required to "maintain inside and outside plant cable and equipment as identified in Appendix 5.2 IAW applicable documents[.]" AR at 135.

Red River argues that the "base telecommunication system ... is a telephone system consisting of a vast array of physical equipment, of which telephone switches are but one part." Pl. Mot. J. at 9 (citing AR at 133 (Performance Work Statement); AR at 213–54 (Equipment Performance Specification); AR at 135–36 (Performance Systems Maintenance)). The Solicitation "also requires the provision of switchboard operators, an obvious feature of a telephone system, not a computer system." *Id.* Moreover, as Red River demonstrates, the BTS for Grissom Air Force Base includes 1973 telephone sets, more than 165,000 feet of buried or underground copper cable, and more than 57,000 feet of fiber optic cable. *See* AR at 316–24 ("Performance Based Work Statement" ("PWS")). Accordingly, the contractor is required physically to locate and mark more than 50,000 feet of cable annually. *See* AR at 322. According to the PWS for Los Angeles AFB, Seymour Johnson AFB, and Whiteman AFB, there are 4,634 telephone sets (and another 964 at a remote location), 3,875 sets and 4,078 sets, respectively. *See* AR at 395, 398, 478–79, 536. There are about 20,-000,205,000 and 30,000 feet of cable to be located and marked, respectively. *See* AR at 389–408, 471–493, 532–549. Thus, Red River concludes that the BTS is a "massive telephone system, not simply a computer." Pl. Reply at 5.

Nevertheless, the Air Force CO selected NAICS Code 811212, "Computer and Office Machine Repair and Maintenance," for this Solicitation, which states:

---

7. As noted in 48 C.F.R. § 19.102(a), other applicable regulations are set forth in Title 13 (Business Credit and Assistance), Part 121, Small Business Size Regulations, in the form of questions and answers.

8. The BDS or Base Distribution System is described as a "base-level information transfer network, which includes the transmission media (*e.g.,* twisted pair, fiber optics, etc.) and associated hardware[.]" AR at 186.

9. The "switching system," identified in Appendix 5.2, includes such items as "twisted pair cable, fiber optic cable, ducts, raceways, cable vaults, manholes, handholes, splice and pedestal enclosures, distribution terminals and blocks, poles, guys, anchors, load coils, lightning protectors, building entrance cable, and house cable ... both analog and digital circuits (voice and data), subscriber loops, off-premise extensions, tie lines, T–1 carriers, LANs, local and long-distance network trunks, and dedicated data or non-switched circuits." AR at 158.

This U.S. industry comprises establishments *primarily engaged in repairing and maintaining computers and office machines* without retailing new computers and office machines, such as photocopying machines; and computer terminals, storage devices, printers; and CD–ROM drives.

AR at 591 (citing NAICS Manual at 875) (emphasis added); *see also* AR at 3. In order to qualify as a small business within the NAICS Code 811212 category, a firm may not have more than average annual receipts of $21 million. *See* AR at 3. Red River does not qualify under NAICS Code 8711212 because it has annual receipts in excess of $21 million. *See* AR at 590; *see also* TR at 6.[10]

The Air Force CO claims that the BTS is "basically computer equipment. All data flows through computer networking. All preventative maintenance is performed through the use of a computer. The programming identifies all parts and components that are tied into the switch. If there is a failure within the switch, it is identified through computer print out. All software upgrades to the switch are performed through the computer." AR at 598. If the BTS is, as the Air Force CO insists, "basically computer equipment," the absence of the words "computer," "computer repair," "computer operations," or "computer maintenance" in the Solicitation's Performance Work Statement, Equipment Performance Specification, or Performance Systems Maintenance description is striking.

Red River claims the Air Force CO's description is "a misrepresentation or at least materially misleading exaggeration of the nature of a telephone switch. Although many of the tasks under the solicitation require special test equipment and some of the equipment is electronic, it is still not a computer." Pl. Mot. J. at 10; *see also* Bryant Aff. at 1. The switching system in the BTS "is used primarily for processing analog (voice) transmissions. Only the 'front-end' processor of the switching system is considered digital. The remaining portion of the switching system consists of analog lines and trunks where the BTS technicians can make adds, moves, and changes.... Even if a switch were considered to be a 'computer,' a review of the solicitation as a whole demonstrates that the switch is only one of thousands of pieces of equipment that comprise the BTS." Pl. Mot. J. at 10; *see also* Bryant Aff. at 1. Red River also points out that the contractor must perform preventive maintenance operations and random testing of all equipment involved in operating the BTS. Pl. Mot. J. at 8–9; *see also* Bryant Aff. at 2. In addition, the Solicitation specified that certain job classifications included "several telecommunications related job classifications such as lineman, cable splicers and telecommunications mechanics, but do not include any computer-related job classifications[.]" Pl. Mot. J. at 11; *see also* AR at 292, 376, 455, 510.

The Air Force CO's Declaration further attempts to rationalize the selection of NAICS Code 811212:

> According to the industry publications I received in making my code selection, the modern switch is a computer processor based system.[11] Moreover, the switches to be maintained under this solicitation are digital switches, not analog switches which were used in older telephone systems.[12]

---

**10.** THE COURT: Excuse me just a second. Are you frozen out because of the size limitation?

MR. BAILEY: Yes, ma'am.
THE COURT: Okay. And what's your revenue sales?
MR. BAILEY: Our revenue-we believe our revenue, although it hasn't been calculated to the dollar, we believe that it's over the 21 million.
THE COURT: Okay. By how much, do you think?
MR. BAILEY: Probably by a million or two. It's not far over, but it's over.
TR at 5–6.

**11.** The Air Force CO's preferred reference source (*see* AR at 597) defines "switch" as a "mechanical, electrical or electronic device, which opens or closes circuits, completes or breaks an electrical path, or selects paths or circuits." Newton's Telecom Dictionary 662 (17th ed.2001). Interestingly, neither the words "computer" or "computer processor based system" appear in this definition.

**12.** Appendix 5.2 of the Solicitation requires, however, that the "switching system" include "both analog and digital circuits (voice and data)[.]" AR at 158.

Based upon these facts, I concluded that the BTS is basically computer equipment.... The extensive use of computers in the operation and maintenance of the BTS was a further factor in my reason for selecting code 811212 here.[13]

Hampton Decl. at ¶ 5.

The Government argues that the Air Force CO's NAICS code selection is discretionary, reasonable and, therefore, the court "should not substitute its judgment for the contracting officer's even though reasonable minds might differ." Gov't Opp. at 21 (citing 13 C.F.R. § 121.402(b) and *Baird Corp. v. United States,* 1 Cl.Ct. 662, 665 (1983)). But the Government simply concludes that, "All of the preventive maintenance is performed through the use of a computer. The program and the programmer identify all parts and components that are tied into the switch. If there is a failure within the switch, it is identified through a computer printout. All software upgrades to the switch are performed through the computer." *Id.* at 18.

Finally, in attempting to explain that the Solicitation falls under subsector 811, "Repair and Maintenance," the Government notes that subsector 81121, "Electronic and Precision Equipment Repair and Maintenance," includes "establishments primarily engaged in repairing and maintaining one or more of the following: ... (2) computers; ... (4) communications equipment[.]" *Id.* at 28. Thus, the Government appears to concede that perhaps NAICS Code 811213 ("Communication Equipment Repair and Maintenance") may be a better alternative:

This U.S. industry comprises establishments primarily engaged in repairing and maintaining communications equipment without retailing new communication equipment, such as telephones, fax machines, communications transmission equipment, and two-way radios.

Gov't Opp. at 28 (citing the NAICS Manual).

The court is persuaded that the NAICS Code 811212 "Office Machine Repair and Maintenance" does not "best describe" the Base Telecommunications System that was to be operated and maintained. The logic of the Air Force CO's decision is based on the flawed premise that because computers are used to *perform* maintenance on a switch, the BTS is therefore a computer. But the use of computers to perform maintenance has no bearing on whether the BTS *itself* is a computer or computer system. Computers can be used to perform many tasks and maintain physical devices, such as a telecommunications system, which contain computer components, but that does not make the system a computer.[14]

Red River also seeks the substitution of NAICS Code 517110, "Wired Telecommunications Carriers," as that which "best describes the purpose of the procurement." *See* Compl. ¶ 9 ("issue declaratory relief providing that the proper NAICS code for this procurement is NAICS 517110."); *see also* Pl. Mot. J. at 24. NAICS Code 517110 provides:

This industry comprises establishments engaged in (1) *operating and maintaining switching and transmission facilities to provide point-to-point communications* via landlines, microwave, or a combination of landlines and satellite linkups or (2) furnishing telegraph and other non-vocal communications using their own facilities. AR at 591 [15] (quoting NAICS Manual at 669)

---

**13.** The Government claims that because the Air Force CO had awarded more than 50 contracts under NAICS 811212 and its predecessor code, without a single challenge, the Air Force CO's code designation comported with procurement precedent. *See* Gov't Opp. at 19 (citing 13 C.F.R. § 121.402(b) advising that a CO may consider a NAICS code used in other procurements). The Administrative Record contains no documentary evidence to support this statement. The Air Force CO's Declaration at Exhibit B includes correspondence concerning only five contracts designated under NAICS code 811212. None of

these documents evidence whether any of these contracts were challenged.

**14.** A computer is defined as an "electronic device that accepts and processes information mathematically according to previous instructions. It provides the result of this processing via visual displays, printed summaries, or in audible form." Newton's Telecom Dictionary 166 (citing AT & T Bell Laboratories definition).

**15.** The relevant definition in the NAICS Manual "Telecommunications" states:

(emphasis added). The size limit for NAICS Code 517110 is not measured in terms of annual receipts, but is limited to no more than 1,500 employees. *See* AR at 589–90.

Red River has made a cogent argument that NAICS 517110 "encompasses, on its face, operation and maintenance of switching and transmission facilities to provide communications via landlines. That definition encompasses *all* of the services required under the solicitation. That is why NAICS 517110 is the *most* appropriate NAICS code for this procurement." Pl. Reply at 19 (emphasis in original). The court's inquiry, however, need only determine that the Air Force CO's selection of NAICS Code 811212 did not comply with 48 C.F.R. § 19.102(b)(1), which requires the NAICS code selected to "best describ[e] the principal nature of the ... service being acquired[.]" 48 C.F.R. § 19.102(b)(1); *see also* 13 C.F.R. § 121.402(b). Having done so, Red River is entitled to judgment on the Administrative Record regarding the Air Force CO's failure to comply with the requirements of 13 C.F.R. § 121.402(b) and 48 C.F.R. § 19.102(b)(1). *See Impresa,* 238 F.3d at 1332–33. The court declines, however, to substitute NAICS Code 517110 for NAICS Code 811212, but remands that determination to the Air Force CO for further consideration.

### b. "Primary Consideration" Was Not Given To The "Relative Value And Importance Of The Components Of The Procurement."

■ Red River also challenges the CO's selection of NAICS Code 811212 because it did not give "[p]rimary consideration to ... the relative value and importance of the components of the procurement[.]" 13 C.F.R. § 121.402; *see also* 48 C.F.R. § 19.102(d) ("When acquiring a product or service that could be classified in two or more industries with different size standards, contracting officers shall apply the size standard for the industry accounting for the greatest percentage of the contract price.").

Red River asserts that "maintenance of the switching system is only 25 % of the overall contract effort," whereas "[b]etween 70% and 80% of the work effort ... is for physical labor such as trenching, locating, marking and installing cable, removing and relocating physical telephone systems and other efforts which are not computer related." Pl. Mot. J. at 9. For example, the Solicitation requires the contractor to submit overhead percentages for each of several labor categories: Telecommunications Mechanic I, Telecommunications Mechanic II, Telephone Lineman, Cable Splicer/Tester, Fiber Optic Technician, and Laborer. *See* AR at 292, 376, 455, 510; *see also* Pl. Reply at 8. The category of "Telecommunications Mechanic II" is qualified to work on the switch, under the Department of Labor definitions. *See* Pl. Reply at 9 (citing the DOL definition at www.dol.gov/esa/regs/compliance/whd/wage/p23931.htm).

The "Service Delivery Summary" sets forth the relative value of the twelve performance components of the Solicitation. *See* AR at 150–52.

---

Industries in the Telecommunications subsector include establishments providing telecommunications and the *services related to that activity. The Telecommunications subsector is primarily engaged in operating, maintaining, and/or providing access to facilities for the transmission of voice, data, text, sound, and video.* A transmission facility may be based on a single technology or a combination of technologies. Establishments primarily engaged as independent *contractors in the maintenance and installation of broadcasting and telecommunications systems are classified in Sector 23, Construction.* Def. Cross–Mot. at 27 (citing the NAICS Manual) (emphasis added) (*see also* the NAICS Manual at http://www.census.gov/epcd/www/naics.html).

| Performance Objective | PWS Reference | Performance Threshold | Performance Standard | Relational Value | Method of Surveillance |
|---|---|---|---|---|---|
| | | | | | |
| Operate and maintain minimum switching system(s) useable availability | 1.3.1.1 | Minimum systems useable availability of 98.5% maintained by Contractor; maximum period of 4 hours downtime shall not be exceeded during any one month period | 100% | 25% | Switch and plant operability 24/7, maintenance personnel availability records |
| | | | | | |
| Maintain inside & outside plant cable & equipment | 1.3.1.2 | 98% in-service availability; Service outage reported within 8 hours of notification by users | 100% | 15% | Records of service downtime, service calls and/or trouble reports |
| | | | | | |
| Perform tests on spare cable pairs and conductors; develop a PMI schedule for testing | 1.3.1.4.1 | Randomly test 10% of spare conductors on monthly basis: Annually, each cable shall be tested through its total count | 100% | 5% | Periodic records review. Coordinate test schedule with CSO. Annotate and maintain test records IAW CDRL A001. |
| | | | | | |
| Restore all system and service outages | 1.3.1.5 | Emergency - 2 hours Catastrophic - 4 hours Serious - 6 hours Routine - 1 duty day | 100% | 10% | Periodic records review. Report problem to the CSO. Coordinate, document and maintain records of all scheduled interruptions and restoration of services |

| Performance Objective | PWS Reference | Performance Threshold | Performance Standard | Relational Value | Method of Surveillance |
|---|---|---|---|---|---|
| | | | | | |
| Provide a key personnel and contact information for contractor availability in case of emergencies, outages, alerts, and exercises 24 hours a day, 365 days a year. | 1.3.1.5.1 | Have a contractor personnel available 100% of time; provide on a quarterly basis an updated listing of available personnel to contact. | 100% | 5% | Periodic record review; by CSO or QAP |
| | | | | | |
| Provide location, staking, and marking services | 1.3.1.6 | Completion within 24 hours for routine location and marking; Two-hour completion time for emergency condition | 100% | 10% | Periodic records review; coordinate adjustments with the CSO |
| | | | | | |
| Perform disk, cartridge, or tape backup of switching systems memory | 1.3.2.5 | Within 24 hours of data base changes; Over 7-day period, perform switching system backup when no changes in performance occur. | 100% | 2% | Visible observance, customer feedback |
| | | | | | |
| Review program/project drawings and provide comments; attend vicinity meetings | 1.3.4.3 | Within 10 working days from receipt of drawings; Attend 8-10 local vicinity meetings per month | 100% | 3% | Visible observance, customer feedback |
| | | | | | |
| Update work center records after completion of new task/work orders | 1.3.5.1 | Update within 5 days after completion | 100% | 5% | Periodic records review |
| | | | | | |
| Completion of work order | 1.4.2.3 | Routine - 10 duty days Priority - 3 duty days Emergency - 1 hour | 100% | 10% | Random sampling |

| Performance Objective | PWS Reference | Performance Threshold | Performance Standard | Relational Value | Method of Surveillance |
|---|---|---|---|---|---|
| | | | | | |
| Identify labor categories and rates, estimated period of time required to accomplish the job, materials estimated to be required to complete the job, and total NTE price for the job. Submit time sheets and proof of material invoices in support of monthly invoices for all T&M line items | 1.4.2.7 | Correct submission of invoice including time sheets and proof of material invoices for T&M line items | 100% | 5% | Periodic Records review |
| | | | | | |
| Prepares accurate invoices, billings, and vouchers and submit to proper personnel and correct location with correct number and copies. | 1.4.2.10 | Accurate submission and distribution of all monthly invoices, billings and vouchers and submit not later than the 5th day of the month following receipt of services. | 100% | 5% | Periodic review of records |

AR at 150-52.

The largest percentage of the Solicitation is the Performance Objective to "Operate and maintain minimum switching system(s) useable availability," which accounts for 25% of the "Relative Value and Importance of the Components of the Procurement." AR at 150. The "Restore all system and service outages" value accounts for 10% of the procurement and is consistent with maintenance of either a computer or a telecommunications system. AR at 150. Assuming *arguendo*, that a "switching system" is considered a computer, the "Perform disk, cartridge, or tape backup of switching systems memory" value is only an additional 2%. AR at 151. The Government argues that these three "computer-related" categories together account for 37% of the relative value and, therefore, the "procurement is properly classified according to the component that accounts for the greatest percentage of contract value, in accordance with 48 C.F.R. § 19.102 and 13 C.F.R. § 121.402." Gov't P.H. Br. at 10.

The other Performance Objective components, accounting for 63% of the procurement, have nothing to do with the maintenance of a computer, but rather the operation and maintenance of a "telecommunications system." *See e.g.*, "Maintain inside & outside plant cable & equipment" (15%); "Perform tests on spare cable pairs and conductors" (5%); "Provide a key personnel and contact information for contractor availability ... 24 hours a day, 365 days a year" (5%); "Provide location, staking, and marking services" (10%). Together the aforementioned components account for 35% of the procurement. Adding these categories to "Restore all system and service outages," which accounts for 10%, the total these telecommunications-related categories account for 45% of the procurement. The remaining categories concern administrative items.

The court has determined that because 63% to 73% of the procurement is related more closely to the maintenance of a telecommunications system than a computer, "primary consideration" was not given to the "relative value and importance of the compo-

nents of the procurement." 13 C.F.R. § 121.402; *see also* 48 C.F.R. § 19.102(d). Accordingly, Red River is entitled to judgment on the Administrative Record regarding the Air Force CO's failure to comply with applicable procurement regulations. *Id.; see also Impresa*, 238 F.3d at 1332.

### 2. Irreparable Harm.

 The court is required to consider whether a plaintiff has an adequate remedy in the absence of an injunction or whether it would suffer irreparable harm. *See Overstreet Elec. Co., Inc. v. United States*, 47 Fed.Cl. 728, 743–44 (2000). The loss of opportunity to compete for a contract and secure any resulting profit has been recognized as constituting "significant harm." *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed.Cl. 312, 323 (1998). Red River's annual revenues appear to preclude it from competing for this significant small business set-aside under NAICS Code 811212. *See* TR at 5–6. In light of the size and duration of the procurement, this is no small loss for Red River—in dollar amount or in the national prestige attached to being the maintenance and operations provider for a "system to provide total telephone service" to four of the most important Air Force bases in the country. *See Overstreet*, 47 Fed.Cl. at 743–44 ("[T]he potential loss of a valuable business on [a] contract . . . has been found sufficient to prove irreparable harm.").

The court recognizes that not every potential bidder has the right to compete for a government contract. *See, e.g., Myers Investigative and Security Services, Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.2002). Therefore, while the harm to Red River would be irreparable, more important is the harm to the procurement process. If the Air Force CO's selection violated FAR regulations as the court has found, irreparable harm has been done to the competitive process and to other potential offerors as well.

### 3. Balance of Hardships.

The balance of hardship element requires "a consideration of the harm to the government." *Overstreet*, 47 Fed.Cl. at 744. In this case, no financial harm will be suffered by the Air Force because the award has not been granted. In fact, the Air Force advised the court that it had no compelling need to award the contract in the immediate future, so it was not opposed to staying the contract award, pending a resolution of the issues raised by Red River's protest. In addition, other potential offerors may be presently excluded under NAICS Code 811212, but able to qualify under a different designation that would better serve the interests of the Air Force, including price considerations.[16] Therefore, in light of the immediate harm to Red River and other potential small businesses, if the contract is awarded, the balance of harm weighs in favor of Red River.

### 4. Effect On The Public Interest.

#### a. The Integrity Of The Procurement Process Was Compromised In This Case.

The importance of ensuring that the public's faith in the government procurement process has not been compromised is a foremost priority of the United States Court of Federal Claims and our appellate court. *See e.g., Central Arkansas Maint., Inc. v. United States*, 68 F.3d 1338, 1343 (Fed.Cir.1995); *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir.1983) (holding that Tucker Act jurisdiction is founded on "an implied contract to have the involved bids fairly . . . considered.") In this case, the court does not question the honesty or integrity of the Air Force CO, but rather the failure to select a NAICS code that "best describes" the plain language description in the Solicitation of the "principal nature of the service being provided" and that demonstrates that "primary consideration" was given to the "relative value and importance of the components of the procurement." It appears to the court that the prior use of NAICS Code

---

**16.** Although not part of the record, the Air Force's recent representation to the court that it would now like to consider Red River's offer in light of changed circumstances further mitigates in favor of setting this Solicitation aside for further consideration by the Air Force CO, outside of the necessary constraints of litigation.

811212, and perhaps the lack of any challenge to that selection in other procurements, was the driving force behind the decision made. In doing so, however, the procurement process was compromised in that the actual requirements of this particular Solicitation were not adequately considered. Where the promotion of small business is a priority, it is even more important that the Contracting Officer ascertain a NAICS Code that complies with procurement regulations, so that as many potential competitors as possible may have an opportunity to compete for these highly coveted contracts.

### b. National Defense And National Security Considerations.

The Tucker Act specifically requires the court to take national defense and national security into account in ruling on bid protest actions. See 28 U.S.C. § 1491(b)(3). Neither party asserted that such considerations are at issue in this procurement.

### CONCLUSION

For the aforegoing reasons, Red River's January 6, 2004 Motion for Judgment on the Administrative Record is granted; the Government's January 20, 2004 Cross–Motion for Judgment on the Administrative Record is denied. Red River's request for a permanent injunction is granted, as follows:

The Clerk of the Court is directed to issue a final judgment that orders the Air Force to set aside the October 15, 2003 Solicitation FA 8773–04–R–0001 to procure monthly Operations and Maintenance (O & M) services in support of Base Telecommunications System and infrastructure, unless and until NAICS Code 811212, "Computer and Office Machine Repair and Maintenance," is changed. *See* 48 C.F.R. § 19.102(b)(1); 48 C.F.R. § 19.102(d) and 13 C.F.R. § 121.402(b).

Both parties will bear their own costs.

**IT IS SO ORDERED.**