# United States Court of Appeals for the Federal Circuit

2008-5034

WEEKS MARINE, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Michael H. Payne, Payne Hackenbracht & Sullivan, of Fort Washington, Pennsylvania, argued for plaintiff-appellee.

L. Misha Preheim, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director. Of counsel on the brief was Thomas J. Warren, CPT, JA, Office of the Chief Counsel, Assistant Counsel for Procurement Law and Contract Disputes, United States Army Corps of Engineers, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Thomas C. Wheeler

# United States Court of Appeals for the Federal Circuit

2008-5034

WEEKS MARINE, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 07-CV-700, Judge Thomas C. Wheeler.

———————————————

DECIDED:  August 10, 2009

———————————————

Before RADER, SCHALL, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL.   Dissenting opinion filed by Circuit Judge DYK.

SCHALL, Circuit Judge.

The United States appeals the November 16, 2007 amended final judgment of the United States Court of Federal Claims, which granted Weeks Marine, Inc. ("Weeks") a permanent injunction after sustaining its pre-award protest.  In sustaining Weeks's protest, the court determined that the Army Corps of Engineers's ("Corps's") solicitation for indefinite duration indefinite quantity ("IDIQ") multiple-award task order contracts ("MATOCs") for dredging was contrary to 10 U.S.C. § 2304(a), and lacked a rational

basis. The court also determined that the solicitation was contrary to a requirement of the Corps's Engineering Federal Acquisition Regulation Supplement ("EFARS"). Weeks Marine, Inc. v. United States, No. 07-700C (Fed. Cl. Nov. 16, 2007) ("Amended Final Judgment"). For the reasons set forth below, we hold that the solicitation does not violate § 2304(a) and does not lack a rational basis.[1] We therefore reverse the Amended Final Judgment insofar as it enjoins the Corps from proceeding with the solicitation. In all other respects the Amended Final Judgment is affirmed.

BACKGROUND

I.

Weeks lodged its protest in response to the Corps's solicitation relating to maintenance dredging and shore protection work in the Corps's South Atlantic Division. The South Atlantic Division encompasses all or part of six states: North Carolina, South Carolina, Georgia, Florida, Alabama, and Mississippi. Currently, the Division has district offices in Wilmington, North Carolina; Charleston, South Carolina; Savannah, Georgia; Jacksonville, Florida; and Mobile, Alabama.

Maintenance dredging removes material (for example, silt and sand) from the bottom of a navigable waterway, in order to facilitate movement of commercial, pleasure, and military vessels. Shore protection restores land along the shoreline that has been damaged by erosion or weather events by redepositing material (for example, sand) along the water's edge.

---

[1] As explained below, we need not decide whether the solicitation is contrary to EFARS.

Up until now, the Corps has awarded dredging contracts in the South Atlantic Division on a district basis through the use of competitive sealed bidding.[2] For each project, the district in which the work is to take place prepares an invitation for bids ("IFB") and receives bids from multiple dredging contractors. After bid opening, the contract is awarded solely on the basis of price and price-related factors. Each district office within the South Atlantic Division assesses its own dredging needs and issues its own IFBs; there is little coordination between the districts.

The MATOC solicitation represents a significant departure from current Corps practice. First, the solicitation employs a negotiated, rather than sealed bidding, format. Second, pursuant to the solicitation, multiple contractors will be awarded indefinite duration indefinite quantity multiple-award task order contracts (IDIQ MATOCs). It is envisioned that, thereafter, an unknown number ("indefinite quantity") of task orders will be issued under each of the contracts. MATOC contractors will submit bids and will compete with each other for task orders as they arise. Through the solicitation, the Corps is seeking to cover all dredging projects within the South Atlantic Division over the next five years.[3]

The Corps created an Acquisition Plan to explain its decision to switch procurement methods, and to provide details about the procurement plan. The Acquisition Plan lists 108 potential projects divided into four MATOC groups: Group I,

---

[2] Currently, dredging contracts are awarded through the Savannah District (serving parts of North Carolina, South Carolina, and Georgia), the Jacksonville District (serving parts of Georgia and Florida), and the Mobile District (serving parts of Georgia, Florida, Alabama, and Mississippi). See U.S. Army Corps. of Engineers, South Atlantic Division, available at http://www.sad.usace.army.mil/contracting.htm.

[3] Upon award, each MATOC contract will have a mandatory one-year base term and four one-year options. Hence, the "indefinite duration" label.

certified hopper dredging projects (2–5 total MATOC contracts);[4] Group II, small

business set-aside projects (2–7 total MATOC contracts); Group III, shore-protection

projects (2–7 total MATOC contracts); and Group IV, other projects not listed in any of

the other three categories (2–7 total MATOC contracts). Each group has an estimated

cost of between $440 million and $500 million for the full five-year period. That means

that, assuming all four option years are exercised, the total cost of the procurement will

be approximately $2 billion. The minimum task order amount is $100,000, while the

maximum is $500 million. Although each MATOC awardee will be guaranteed a

contractual minimum of $2500, there is no guarantee that any awardee will receive

more than that amount.

The Corps will evaluate proposals it receives in response to the solicitation on a

"best value" basis. The evaluation will take into account four factors: (1) technical merit,

(2) past performance, (3) price, and (4) utilization of small businesses. The technical

merit factor will assess whether a party submitting a proposal possesses dredging

equipment. A party's past performance rating may vary from "very low risk," to "very

high risk," with four intermediate levels. The risk factor will assess a prospective

contractor's competency in performing prior work (rated on a six-level scale), and the

relevancy of that work (rated on a three-level scale). As far as price is concerned, the

solicitation includes four representative tasks. Each party submitting a proposal in

response to the solicitation will submit a bid on one of the tasks, thereby allowing the

Corps to evaluate the price factor for that party. Weeks Marine, Inc. v. United States,

79 Fed. Cl. 22, 27 (2007) ("Initial Opinion"). The Corps will pick several contractors for

---

[4]     Hopper dredging involves the use of specialized equipment. The Corps asserts only a small number of dredgers have this equipment.

each MATOC based on the four listed factors. Individual task orders under the MATOCs will be awarded primarily using Low Price Technical Acceptable procedures, although the Corps states in the Acquisition Plan that it will use Best Value Trade Off procedures for some tasks.

Before issuing the solicitation, the Corps "conducted market research," in order to evaluate potential interest in the solicitation and the availability of contractors for the task order work. Ten contractors, including Weeks, indicated interest in the solicitation. Weeks is a large marine construction and dredging company. It performed eighteen dredging contracts for the South Atlantic Division in the five years prior to the solicitation. Weeks was one of only three contractors that expressed interest in the solicitation that had (1) unlimited bonding capability, (2) hopper dredging equipment, and (3) significant dredging experience.

II.

The MATOC solicitation issued on June 4, 2007. On September 28, 2007, Weeks filed suit in the Court of Federal Claims, seeking declaratory and injunctive relief to prevent the South Atlantic Division from moving forward with the procurement. After the Corps filed a 2000 page administrative record, the parties filed cross motions for judgment on the administrative record. After hearing oral argument, the court issued a sealed version of its opinion on November 1, 2007. The opinion was made public on November 6, 2007, after the parties had a chance to review the sealed version and submit proposed redactions of confidential information. Initial Opinion, 79 Fed. Cl. at 22.

In the <u>Initial Opinion</u>, the Court of Federal Claims ruled that the MATOC solicitation violated 10 U.S.C. § 2304(a)(2), which provides that sealed bidding must be used when an agency plans to award a contract based solely on price and price-related factors. <u>Initial Opinion</u>, 79 Fed. Cl. at 29–30. Although the Corps indicated it would be evaluating non-price-related factors, the court found that the "evaluation factors will not permit the determination of any meaningful distinctions among the offerors, nor will they allow for any different ways to make task orders awards." <u>Id.</u> at 30. Thus, the court reasoned the Corps would actually be making its determination based on price. <u>Id.</u>

The Court of Federal Claims also ruled that the MATOC solicitation had no rational basis. Having ruled in its disposition of the § 2304(a) issue that the Corps would not be considering non-price related factors, such as contractor qualifications, the court rejected the additional justifications proffered for the Corps's procurement action. <u>Initial Opinion</u>, 79 Fed. Cl. at 31–34. The government asserted the use of IDIQ MATOCs would reduce the procurement cycle, but the court found "the record contain[ed] no evidence showing that a shortened procurement cycle would enhance [the] ability to complete projects in a timely manner." <u>Id.</u> at 32. Although the government asserted that the new procurement scheme would reduce administrative costs by $1.5 million over two years, the court found "no evidence of how this savings is calculated, or how it will occur." <u>Id.</u> at 33. Further, the court found that the hours estimated for evaluating the proposals received in response to the solicitation were too low for a negotiated procurement, and that administrative costs thus would likely be much higher than estimated. <u>Id.</u> The government also argued that IDIQ MATOCs would reduce the need for emergency procurements. However, the court rejected this

contention as well, indicating that emergency procurements had constituted only 2.4 percent of South Atlantic Division expenditures in the prior two years, and did not justify a "procurement overhaul." Id. Additionally, the government asserted that the IDIQ MATOCs would increase coordination between the districts in the Corps's South Atlantic Division. The Court of Federal Claims found, though, that the need for increased coordination did not warrant a change from sealed bidding, but rather necessitated the vesting of oversight in one office. Id. at 33–34. The court then dismissed in summary fashion all other arguments proffered by the government, stating that the record was "devoid of credible evidence" that competition would increase, that small businesses would benefit, or that national security would be improved through the use of IDIQ MATOCs. Id. The court thus concluded that the proposed solicitation lacked a rational basis. Addressing the regulatory framework, the court concluded that the solicitation did not comply with the EFARS requirement that indefinite delivery contracts could only be used in certain limited circumstances. Id. at 31.

Having determined that the solicitation did not comply with § 2304(a) and the EFARS, and lacked a rational basis, the Court of Federal Claims ruled that Weeks had succeeded on the merits of its protest. The court then turned to the remaining three factors to be considered in determining whether an injunction should issue: irreparable harm, the balance of hardships, and the public interest. See, e.g., Centech Group, Inc. v. United States, 554 F.3d 1029, 1036–37 (Fed. Cir. 2009); PGBA, LLC v. United States, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Doing so, the court concluded injunctive relief was appropriate. Initial Decision, 79 Fed. Cl. at 34–37. The court therefore granted Weeks's motion for judgment on the administrative record, and denied

the government's motion. As a result, the court entered an order enjoining the Corps "from using Solicitation No. W 912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services." Id. at 37.

On November 7 and 8, 2007, the Corps issued presolicitation notices announcing individual negotiated procurements for the same four task orders that were to be used as the basis for proposal evaluation under the enjoined solicitation. The proposed contracts were styled as separate negotiated procurements (as opposed to IDIQs), and thus were viewed by the Corps as eliminating the ability to issue any "follow-on task orders." Asserting that these notices violated the injunction, Weeks filed a motion to enforce or amend the November 1, 2007 judgment. It also requested an order to show cause as to why the Corps should not be found in contempt of court. The Court of Federal Claims conducted a hearing on these issues on November 15, 2007. On November 16, 2007, the court vacated the November 1 injunction, and issued a new order to amend and enforce judgment. Amended Final Judgment, slip op. at 4. The new order enjoined the Corps with respect to three of the solicitations. Id. at 3. The court allowed the fourth solicitation, relating to a dredging project for Kings Bay, Georgia and Fernandina Harbor, Florida, to proceed because of unique obstacles to sealed bidding at those sites. Specifically, the court noted particular "urgency surrounding this project," and heightened military and national security needs. Id. at 3. The government has timely appealed the Amended Final Judgment.[5]

---

[5] The parties have advised us that the Corps has suspended action on the MATOC procurement pending this appeal.

DISCUSSION

I.

Under 28 U.S.C. § 1491(b)(1), the Court of Federal Claims is authorized "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or [to] any alleged violation of statute or regulation in connection with a Federal procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1) and (c)(1).

We review the Court of Federal Claims's "determination on the legal issue of the government's conduct, in a grant of judgment upon the administrative record, without deference." Bannum v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). We thus apply the "arbitrary and capricious" standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), conducting the same analysis as the Court of Federal Claims. 28 U.S.C. § 1491(b)(4); Bannum, 404 F.3d at 1351. In applying the APA to protests such as the one before us, we determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." PGBA, LLC, 389 F.3d at 1225. On appeal, the government argues that Weeks has not alleged competitive injury, and therefore does not have standing to challenge the MATOC solicitation. On the merits, the government contends that the solicitation facially considers factors other than price, and thus does not violate 10 U.S.C. § 2304(a). It also argues that the decision of the Corps to switch from sealed bidding to negotiated procurement IDIQ MATOCs has a rational basis and does not violate the EFARS. We first address the issue of standing.

II.

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.  For that reason, every federal appellate court has a special obligation to 'satisfy itself . . . of its own jurisdiction . . . .'"  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).  "The Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III."  Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003). "Whether a party has standing to sue is a question that this court reviews de novo, although we disturb [the Court of Federal Claims's] factual findings only if they are clearly erroneous."  Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366 (Fed. Cir. 2002) (citations and internal quotation marks omitted) (alteration in original).

The standing issue in this case is framed by 28 U.S.C. § 1491(b)(1), which we have found imposes more stringent standing requirements than Article III.  Cf. Am. Fed'n of Gov. Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("We . . . are not convinced that Congress, when using the term 'interested party' to define those who can bring suit under § 1491(b)(1), intended to confer standing on anyone who might have standing under the [Administrative Procedure Act].").  Section 1491(b)(1) provides that the Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal

Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). For purposes of this case, the pertinent part of § 1491(b)(1) is that which states that an "interested party" may object "to a solicitation . . . for bids or proposals for a proposed contract" or to "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." We have held that standing under § 1491(b)(1) "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." Am. Fed'n of Gov't Employees, 258 F.3d at 1302. Thus, to come within the Court of Federal Claims's § 1491(b)(1) bid protest jurisdiction, Weeks is required to establish that it "(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006). We have stated that "[t]o prove a direct economic interest as a putative prospective bidder, [the bidder] is required to establish that it had a 'substantial chance' of receiving the contract." Id.; see also Info. Tech. & Applications v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580 (Fed. Cir. 1996) (same).

The government concedes that the "prospective bidder" prong of the interested party test is met in this case. It acknowledges that Weeks intends to bid on the MATOC contracts, is able to do so, and is capable of doing the dredging work contemplated by the contracts. At oral argument, government counsel stated, "[P]art of the standard

requires that you actually be a contractor, that you have the financial wherewithal to actually bid on these projects, [and] the technical capability as well." Oral arg. 8:20–8:40 (Jan. 7, 2009), available at http://oralarguments.cafc.uscourts.gov/mp3/2008-5034.mp3. Continuing, counsel stated that this aspect of the interested party test was not disputed. Id. at 8:45-47. As noted, Weeks performed eighteen dredging contracts for the South Atlantic Division in the five years prior to the solicitation. And, as also noted, Weeks was one of only three contractors that expressed interest in the solicitation that had (1) unlimited bonding capability, (2) hopper dredging equipment, and (3) significant dredging experience. Indeed, the government has conceded that Weeks will almost certainly be in the MATOC pool. See Appellant's Br. 48 ("[E]ven the trial court recognized that Weeks would likely have received one of the awards under the MATOC.").

Turning to the "direct economic interest" prong of the interested party test, however, the government argues that Weeks has failed to demonstrate prejudice or harm arising from the MATOC solicitation. According to the government, any potential injury to Weeks is speculative, and is not the competitive injury required for standing because it is borne equally by all bidders. The government contends that Weeks's allegations simply amount to a critique of IDIQ contracts in general rather than a particularized injury due to the use of such contracts. Appellant's Br. 46. The government argues that Weeks has not established a "harm that ties the company's business situation to the solicitation at issue." Oral arg. 8:20–8:25. In other words, the government argues that Weeks cannot establish that there was "not only some significant error in the procurement process, but also that there was a substantial

chance it would have received the contract but for that error." <u>Statistica</u>, 102 F.3d at 1582. The government urges that the "substantial chance" test is the test for proving economic interest and prejudice, even in the pre-award context. In making this argument, the government draws upon our standing discussions in post-award bid protests. <u>See, e.g.</u>, <u>Info. Tech.</u>, 316 F.3d at 1319 ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits. . . . To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."); <u>Myers Investigative & Sec. Servs.</u>, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing. . . . [T]he substantial chance rule continues to apply.").

Weeks responds that it will suffer prejudice from having to compete in a "discretionary, subjective, and essentially unreviewable process," which, it contends, violates applicable laws and regulations. Appellee's Br. 41. Weeks also argues that "an unauthorized or irrational form of solicitation" will impact its ability to compete and thrive because it has "built [its] compan[y] and marketing plan" around the long-used system of sealed bidding. Oral arg. at 18:25–18:30. Weeks maintains further that its injury is not merely a critique of the IDIQ procurement method, but rather stems from the "agency's choice to use an unauthorized contract vehicle that violated procurement statutes and regulations and lacked a rational basis." Appellee's Br. 50. Finally, Weeks counters that the "substantial chance" test is inappropriate in the pre-award context because "[a]t the pre-award juncture, a plaintiff usually will not know who the other offerors are and may not know [its] <u>bona fides</u>." <u>Red River Serv. Corp. v. United States</u>,

60 Fed. Cl. 532, 539 (2004). Thus, Weeks advocates for the pre-award test articulated by the Court of Federal Claims in <u>WinStar Communications, Inc. v. United States</u>, 41 Fed. Cl. 748 (1998), and adopted by the Court of Federal Claims in this case. In <u>WinStar</u>, the Court of Federal Claims stated that a prospective offeror could establish the prejudice necessary for standing by showing "a non-trivial competitive injury which can be redressed by judicial relief." <u>Id.</u> at 763.

Section 1491(b)(1) provides in pertinent part that an "interested party" may object to a solicitation . . . for bids or proposals for a proposed contract" or to "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." As just discussed, the government does not dispute that Weeks meets the "prospective bidder" prong of the interested party test.

We have not had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder/offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. <u>See, e.g.</u>, <u>Statistica</u>, 102 F.3d at 1582 (holding that a contractor lacked standing because it failed to show a "substantial chance it would have received the contract award but for" agency error). The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a "but for" prejudice analysis. However, Article III considerations require a party such as Weeks to make a showing of <u>some</u> prejudice. <u>See, e.g.</u>, <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 553, 560 (1992) ("First, the plaintiff

must have suffered an 'injury in fact' . . . ."); <u>Myers Investigative & Sec. Servs.</u>, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").

The Court of Federal Claims has advocated several different standards for evaluating standing in pre-award bid protests. In <u>Red River Service Corp.</u>, the court indicated it would follow the plain statutory language and our holding in <u>American Federation</u> that § 1491(b)(1) "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." 60 Fed. Cl. at 539. The court declined to add any additional judicial gloss "until the United States Court of Appeals for the Federal Circuit directs otherwise." <u>Id.</u> At the same time, in some pre-award cases, the Court of Federal Claims has continued to recite the substantial chance test. <u>See, e.g.</u>, <u>L-3 Commc'ns EOTech, Inc. v. United States</u>, 83 Fed. Cl. 643, 651 (2008); <u>CNA Corp. v. United States</u>, 81 Fed. Cl. 722, 725–26 (2008). In this case, the court chose to use the <u>WinStar</u> standard, where standing is established by alleging "a non-trivial competitive injury which can be redressed by judicial relief." <u>See also</u> <u>Allied Materials & Equip. Co. v. United States</u>, 81 Fed. Cl. 448, 456 (2008) (advocating the <u>WinStar</u> standard).

Upon consideration of the matter, we conclude that the standard applied by the Court of Federal Claims in this case strikes the appropriate balance between the language of § 1491(b)(1), which contemplates an "an action by an interested party objecting to a solicitation for bids or proposals . . . or any alleged violation of statute or regulation in connection with . . . a proposed procurement," and Article III standing requirements. We therefore consider whether Weeks has demonstrated a "non-trivial competitive injury which can be addressed by judicial relief." We conclude that it has.

We agree with the Court of Federal Claims's assessment of the "non-trivial" competitive" injury faced by Weeks based upon its contention as to the illegality of the MATOC solicitation. The court stated

> Weeks was one of only three contractors that had "unlimited" bonding capability, "significant" dredging experience, and possessed Coast Guard certified equipment for Group One projects. AR 21. Under sealed bidding procedures, there is a substantial chance that Weeks would be the lowest responsive and responsible bidder on a significant portion of the $1,392,000,000 in projects in Groups I, III, and IV. Under the IDIQ task order solicitation, however, Weeks would only be guaranteed a minimum of $2,500 and [the South Atlantic Division] could deny Weeks all task orders for the next five years without any explanation or discussions, or any ability for Weeks to seek bid protest review. This non-trivial competitive injury is capable of being redressed by this Court.
>
> . . . .
>
> In this case, the solicitation prevents Weeks from competing for $1,392,000,000 in task order awards over the next five years through sealed bidding.

Initial Opinion, 79 Fed. Cl. at 35.

Weeks established an interest in bidding, sent in complaints and concerns, noted its contracting ability, and suggested it would likely receive a substantial percentage of the contracts in sealed bidding. Whether Weeks is the winning or losing bidder, according to Weeks's theory of the case the solicitation may eventually be overturned due to illegality. This is not a pre-award case where the alleged violation is "immaterial" and will not have an impact on Weeks's economic situation. See CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988) (discussing prejudice in the pre-award context). Rather, Weeks has a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations. If the MATOC

solicitation is allowed to go forward, it will dictate Weeks's bidding and government work in the South Atlantic Division for the next five years. In sum, Weeks is an interested party who has demonstrated the requisite degree of prejudice for standing. We therefore hold that it has established standing.

Our conclusion that Weeks has standing to challenge the MATOC solicitation is consistent, we think, with our decision in Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007). We believe that Blue & Gold Fleet helps compel our conclusion that Weeks has statutory standing. Section 1491(b)(1) specifically confers jurisdiction on the Court of Federal Claims to hear pre-award bid protests, stating an "interested party" may object to "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." In Blue & Gold Fleet we held "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313. In Blue & Gold Fleet, the government issued a solicitation for, inter alia, "ferry transportation" and "concessions" services at Alcatraz Island. Id. at 1311. After Blue & Gold lost the contract, it filed a protest indicating that the awardee had not properly included in its bid "the wages and benefits for its employees required by the Services Contract Act." Id. at 1312. The Court of Federal Claims concluded that Blue & Gold was actually challenging the terms of the solicitation, and thus had waived its opportunity to protest. We agreed, noting that the solicitation itself "did not include any requirement that the bidders consider the Service Contract Act." Id. at 1313. Thus, Blue & Gold was actually challenging the terms and

requirements of the solicitation. In holding that Blue & Gold had waived its opportunity to protest, we noted the GAO regulation, 4 C.F.R. § 21.2(a)(1), indicating that GAO protests "based upon alleged improprieties in a solicitation which are apparent prior to . . . the time set for receipt of initial proposals shall be filed prior to . . . the time set for receipt of initial proposals." Blue & Gold Fleet, 492 F.3d at 1314. We stated that "'[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award . . . .'" Id. (quoting Argencord Mach. & Equip. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).

In light of Blue & Gold Fleet, were we to hold that Weeks cannot now challenge the MATOC solicitation in the Court of Federal Claims, we effectively would be saying that this court has set up a judicial scheme whereby a party runs afoul of the waiver rule if it waits to challenge a solicitation (as Blue & Gold did), but is properly dismissed on standing grounds if it raises the challenge pre-award (as Weeks has done). Such a result would be anomalous.

Finally, by its terms, § 1491(b)(1) indicates that interested parties are able to challenge facial defects in solicitations. Cf. Ramcor Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("If § 1491(b) required a challenge to the merits of the contract award, the contractor would never need to use the 'violation' prong but could always rely on other jurisdictional grants in § 1491(b)(1)."). Thus, in some cases the injury stemming from a facially illegal solicitation may in and of itself be enough to establish standing; in such a case a bidder should not have to wait until the solicitation is applied unfavorably to establish injury.

For the foregoing reasons, we conclude that in a pre-award protest such as the one before us, prospective bidder or offeror must establish "a non-trivial competitive injury which can be redressed by judicial relief" to meet the standing requirement of § 1491(b)(1). Under that standard, we hold that Weeks has standing to challenge the MATOC solicitation in the Court of Federal Claims. We turn now to the merits.

III.

We first address Weeks's contention that the MATOC solicitation violates 10 U.S.C. § 2304(a). Section 2304(a) provides that, in conducting a procurement for property or services, an agency "shall obtain full and open competition through the use of competitive procedures." 10 U.S.C. § 2304(a)(1)(A). The statute directs agencies to "use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement." Id. § 2304(a)(1)(B). In that regard, it states:

> (2) In determining the competitive procedure appropriate under the circumstances, the head of an agency—
>     (A) shall solicit sealed bids if—
>         (i) time permits the solicitation, submission, and evaluation of sealed bids;
>         (ii) the award will be made on the basis of price and other price-related factors;
>         (iii) it is not necessary to conduct discussions with the responding sources about their bids; and
>         (iv) there is a reasonable expectation of receiving more than one sealed bid; and
>     (B) shall request competitive proposals if sealed bids are not appropriate under clause (A).

Id. § 2304(a)(2).

On appeal, the government argues that, on its face, the MATOC solicitation considers non-price-related factors, and that therefore the Corps is using a negotiated

procurement under § 2304(a)(2)(B).  Specifically, the government contends the Corps is addressing (1) technical merit, (2) past performance, and (3) small business concerns. The solicitation, the government notes, states that "past performance is considered significantly more important than price" and that "all evaluation factors, when combined, are significantly more important than price."  Weeks responds that while the Corps states that it will be evaluating non-price factors, and that the solicitation thus falls under § 2304(a)(2)(B), a closer look at the solicitation and the dredging industry reveals that the Corps will continue to limit its inquiry to price and price-related factors only.  Thus, Weeks contends the solicitation is covered by § 2304(a)(2)(A) and that sealed bidding is required.

We conclude that Weeks has not established a violation of § 2304(a).  The solicitation expressly states that the Corps will consider non-price factors, and that past performance is "significantly more important than price."  In addition, in the solicitation the Corps explained how it will evaluate technical merit, past performance, and small business factors.  Moreover, Weeks acknowledged at oral argument that, its arguments relating to the Corps's intentions notwithstanding, the Corps has complied with the requirements of § 2304(a):

> **The Court:** "It does on its face say 'we're going to consider non-price-related factors'—isn't that the end of it?"
> **Weeks:** "Facially yes . . . they have satisfied what the statute requires . . . ."
> **The Court:** "Doesn't the case then come down to whether the government established a rational basis for the structuring of the procurement?
> **Weeks:** "Yes, I believe it does . . . I think that is more what the case is about."

Oral arg. at 30:51-31:21.  It is to the issue of rational basis that we now turn.

IV.

The government argues that the Court of Federal Claims erred in ruling the Corps's procurement action lacked a rational basis. In making this argument, it contends that the court should not have dismissed the Corps's reasons for switching to a negotiated procurement scheme. The government argues, as it did in the Court of Federal Claims, that the IDIQ MATOCs will allow the Corps to (1) pick more qualified contractors because it will be able to rely on factors other than price; (2) reduce procurement time; (3) lower administrative costs by an estimated $1.45 million in the next two years; (4) reduce or eliminate the need for emergency procurements; (5) have greater coordination between individual districts of the South Atlantic Division; (6) facilitate the use of small businesses; and (7) promote national security through more timely execution of dredging near military bases.

Addressing its first rationale, the government argues that the responsibility determinations the Corps currently is required to make pursuant to Federal Acquisition Regulation ("FAR") § 9.401-1, 48 C.F.R. § 9.104-1, when there is sealed bidding, are not adequate surrogates for the evaluations of past performance it requires.[6] According to the government, a FAR responsibility determination only addresses whether a contractor has a "satisfactory performance record." By contrast, the MATOC negotiated procurement scheme, it is urged, will allow for more nuanced evaluations. A prospective contractor may receive different ratings for various criteria, and the Corps will have the flexibility to weigh different factors as it sees fit. The government indicates that the more detailed rating system for competency and relevancy in the MATOC

---

[6] FAR § 9.104-1 provides that a contractor must satisfy seven criteria in order to be deemed "responsible."

solicitation will allow the Corps to avoid hiring contractors who may do "satisfactory" work, but may not have the particular expertise needed to perform certain dredging jobs. Through the consideration of past performance, the government contends the Corps will be able to have dredging work done by contractors with the highest skills and who offer the best value. See Acquisition Plan at 2 ("It has become increasingly difficult in today's operating environment to obtain bids from responsible contractors capable of meeting performance requirements and time constraints.").

As to reduction in procurement time, the government states that "time is of the essence" because (1) "environmental windows compress the schedule for dredging in much of the South Atlantic region," and (2) unplanned events often arise that call for increased flexibility. The Corps estimates the IDIQ solicitation method could save as much as forty-five days per project in terms of the bidding period alone.[7] See Acquisition Plan ("It is estimated that this contracting mechanism will save as much as 45 days in the procurement cycle of each project."). Further, the government argues that the new procurement scheme will "spare [the South Atlantic Division] from the need to construct time-intensive Invitation[s] for Bids, since a task order can be created more quickly," thus saving additional time and resources. Appellant's Br. 30; see Acquisition Plan ("[T]here is limited time to prepare the invitation for bid . . . or the request for proposal . . . . This will be mitigated by the development of IDIQs which allow for a significant reduction in acquisition time. In addition, issuance of task orders is a faster

---

[7] The Corps indicates that the new procurement scheme eliminates the fifteen-day notice period required before invitations for sealed bids, as well as the thirty-day response time for receipt of bids.

procurement method and allows more time for actual project performance thereby minimizing schedule risks.").

As far as administrative costs are concerned, the government notes that the South Atlantic Division spent $2,183,949 on procurement labor in 2006 and 2007, whereas under the new IDIQ MATOC approach, the Corps predicts it will spend $738,026 in the next two years on procurement labor. The Corps explained in the Acquisition Plan that these savings will be particularly important because "workload has significantly increased over the years while personnel staffing has either remained the same or decreased. . . . [The Corps] must implement more cost effective acquisition methods that reduce labor intensive procedures in contracting, operations, & engineering." Appellant's Br. 38.

Regarding emergency procurements, the government points out that the Corps has emphasized that the IDIQ MATOCs will allow for greater competition in emergency situations, because a pool of contractors will be ready to bid on a given project, and preparation of task orders will require less time than the preparation of IFBs. See Acquisition Plan ("[W]ith MATOCs in place, any emergency dredging requirements could be competed among the MATOC holders; thereby, eliminating the need for issuing costly sole source contracts."); Appellant's Br. 32, 38–39. The government concludes this will lead to greater competition, faster results, and lower costs than the current emergency protocols.

With respect to improved coordination among the districts of the South Atlantic Division, the government emphasizes that the Division currently does not coordinate solicitations among the districts. In that regard, the Acquisition Plan notes the need to

"[d]evelop a consistent methodology and process for soliciting, monitoring and administering dredging and shore protection projects." It also notes the need to "[r]emove the continual struggle between the [South Atlantic Division] Districts over resources when contracting for work that falls within the same environmental windows." Because the IDIQ MATOCs will encompass all projects for the Division for the next five years, no such conflicts will arise. According to the government, the Corps anticipates that this new procurement scheme will allow it "to award a task order to a quality dredger that may be busy with work and therefore would not have submitted a sealed bid." Appellant's Br. 40; see also Acquisition Plan ("By having a ready pool of dredging companies who can do the work, [the South Atlantic Division] can more easily allow quality performance to influence the decision making process.").

The government next argues the IDIQ MATOCs will enhance opportunities for small businesses because Group II is a small-business set-aside group, and the Corps will be able to readily evaluate the small business factor because it no longer will be bound by the sealed bidding protocol of only considering price. Appellant's Br. 42 n.9; see also Acquisition Plan ("[The South Atlantic Division] intends to group the projects which have historically been set aside for small businesses and to solicit these projects under one grouping providing for the maximum practicable number of awards to small businesses in every known category, thereby providing the small business community with the same level of opportunity to compete for dredging projects as in the past.").

Finally, the government contends that IDIQ MATOCs will promote national security because task orders around military bases will be assigned quickly, and completed efficiently and skillfully. The government argues that the Corps must

possess the leeway to ensure military preparedness, stating that shoaling in the Southeast Atlantic and the Gulf of Mexico was so severe in recent years that emergency contracts were issued to ensure continued navigability for military needs. See Acquisition Plan ("Some shoaling became so severe that emergency contracts were required in order to maintain channel depths and allow access by both commercial and military vessels."); Appellant's Br. 43.

Weeks counters that the Court of Federal Claims carefully analyzed and rejected the Corps's asserted rationales, and properly found that the MATOC solicitation lacked a rational basis. As far as the selection of more competent contractors is concerned, Weeks argues that the Corps's "technical merit" concern only addresses whether the contractor has the appropriate equipment. Weeks states that, even under sealed bidding, FAR § 9.104-1 provides that "a prospective contractor must—(f) have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them." Weeks additionally contends that the Corps's new past performance evaluation is commensurate with the "responsibility determination" the Corps currently undertakes when evaluating contractors in sealed bidding. Weeks notes that, under the FAR, the Corps must ascertain whether each contractor has a "satisfactory performance record." FAR § 9.104-3(b), 48 C.F.R. § 9-104-3(b). In that regard, it observes that FAR § 9.104-3(b) specifically provides that when evaluating a contractor's past performance, the "contracting officer" should "consider the number of contracts involved and the extent of deficient performance in each contract . . . ." Id. Weeks further notes that a contracting officer must look to the "tenacity" and "perseverance" of each contractor, id., and that an agency can develop and utilize special, more probing responsibility

standards, as long as those standards are published in the solicitation. FAR § 9.104-2, 48 C.F.R. § 9.104-2. Finally, Week recites that, under FAR § 9.105-1, 48 C.F.R. § 9.105-1, an agency can obtain significant information about a contractor who is "the low bidder" or "in range for [the] award." Weeks urges that, under these various FAR provisions, a procuring officer can obtain all the information he or she needs in order to evaluate a prospective contractor. Appellee's Br. 16.

Turning to the rationale that the IDIQ MATOCs will reduce the time required for the procurement cycle, Weeks argues that the administrative record provides no evidence that normal sealed bidding procedures have caused, or will cause, unacceptable delay. Further, Weeks disputes the government's contention that the new procurement scheme will save forty-five days per task order, as the South Atlantic Division informed concerned contractors it intends to keep the present thirty-day response period "whenever possible." Therefore, Weeks argues, the Corps will save a maximum of fifteen days.

Addressing the Corps's asserted ability to prepare task orders more quickly than sealed bids, and thus reduce procurement time, Weeks notes that the four "seed" task orders, which the solicitation states will be used to evaluate the price factor, are over 1500 pages in total length. According to Weeks, these task orders are similar in length to the proposals used in sealed bidding, and therefore the Corps cannot seriously contend the new system will result in significant savings of procurement time.

Turning to administrative costs, Weeks notes that the Court of Federal Claims found the record "lack[ed] any evidence of how the agency determined the IDIQ and task order hours" used to evaluate those costs. Initial Opinion, 79 Fed. Cl. at 33.

Weeks notes that § 207.170-3(ii) of the Department of Defense FAR Supplement provides that "[s]avings in administrative or personnel costs alone do not constitute a sufficient justification for the consolidation of contract requirements unless the total amount of the cost savings is expected to be <u>substantial</u> in relation to the total cost of procurement." In this case, Weeks states the total cost of dredging procurements is approximately $800 million for two years. Thus, Weeks posits that the savings which the Corps projects will arise from the solicitation ($1,445,923 in savings for an $800 million contract) will only amount to 0.18% of the two-year cost of the procurement—far below "substantial" savings. <u>Id.</u>

Continuing, Weeks states that, in a true emergency, even an IDIQ MATOC will not suffice. According to Weeks, the Corps still will have to resort to the provisions of the FAR because only that procurement scheme allows the Corps to move rapidly enough to meet dredging and shore protection needs in an emergency.[8] Appellee's Br. 31–32. Addressing the matter of coordination of procurement activity, Weeks indicates that the Corps has provided no empirical evidence indicating conflicts between the districts of the South Atlantic Division. <u>Id.</u> at 34.

Next, Weeks disputes the government's assertion that the IDIQ MATOC scheme will benefit small businesses. First noting that small businesses received $189 million of the $750 million spent on dredging projects over the past two years, Weeks argues that the new plan will actually reduce the ability of small businesses to compete. Group II

---

[8] For provisions addressing emergency situations, <u>see, e.g.</u>, FAR § 6.302-2, 48 C.F.R. § 6.302-2 (full and open competition is not required "[w]hen the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals"); <u>see also</u> FAR part 18, 48 C.F.R. §§ 18.000–18.204 ("Emergency Acquisitions").

under the MATOC scheme, the small-business set-aside group, has a bonding requirement that ranges between $10 and $25 million. According to Weeks, this requirement exceeds the minimum bonding requirement the Corps normally requires for small businesses ($10 million). Weeks contends that any small company that can only post a $10 million bond will be precluded from competing for contracts for which it could previously bid under sealed bidding procedures. In essence, Weeks argues that the Corps has raised bonding requirements and has added barriers to entry for small businesses that want to compete for dredging contracts. Appellee's Br. 36–37. As to the Corps's final rationale, Weeks argues that the Corps has not "provided any evidence that military waterways in the Southeast ever have been imperiled or jeopardized." Id. at 37 (quoting Initial Opinion, 79 Fed. Cl. at 34).

V.

We have stated that procurement decisions "invoke[ ] 'highly deferential' rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (2008) (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). Under that standard, we sustain an agency action "evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, 216 F.3d at 1058.

The Corps has presented seven reasons for its new procurement scheme. As seen, through the use of IDIQ MATOCs, the Corps expects to (1) obtain qualified contractors; (2) reduce procurement time; (3) realize savings in administrative costs; (4) reduce or eliminate the need for emergency procurements; (5) allow for greater coordination between the districts in the South Atlantic Division; (6) facilitate the use of small businesses; and (7) be able to address national security needs through more

timely execution of dredging near military bases.  We think it can hardly be argued that any one of these is not a legitimate procurement objective.

Recognizing our deferential review of an agency's procurement decision, Weeks does not argue that the Corps's objectives are not legitimate.  Rather, it takes the position that the Corps has not demonstrated that IDIQ MATOCs are necessary to achieve those objectives.  In so doing, Weeks makes much of the fact that the solicitation and the Acquisition Plan provide little empirical evidence connecting the Corps's needs to the new procurement scheme.  For the following reasons, we are not persuaded by Weeks's argument.

After the Court of Federal Claims decided this case, we rendered our decision in CHE Consulting.  In CHE Consulting, the United States Naval Oceanic Office ("NAVO") sought to solicit a single provider for the hardware and software maintenance of a complex supercomputer system.  552 F.3d at 1352.  Eventually, after a request by CHE Consulting ("CHE"), the General Services Administration separated the procurement into two contracts—one for hardware and one for software.  Id. at 1353.  In response to the revised solicitation, CHE submitted a hardware maintenance proposal, but NAVO indicated it would not accept "de-bundled" proposals.  Id.  Following direction from NAVO, the General Services Administration, which had issued the solicitation, cancelled it, and issued a new solicitation requiring a single provider for both hardware and software maintenance.  Id.  Thus, the two maintenance requirements were "bundled."

CHE brought a protest in the Court of Federal Claims, arguing that the bundling requirement lacked a rational basis and requesting an injunction with respect to the bundled solicitation.  CHE, 552 F.3d at 1353.  After examining the administrative record,

the Court of Federal Claims found the evidence supporting the new solicitation "sparse," and requested supplementation of the record. Specifically, the court asked for a cost analysis and empirical survey evidence on the practices of other agencies. Id. After the record was supplemented, the court ruled the bundling requirement had a rational basis. Id. at 1353–54. Accordingly, the court rejected CHE's challenge to the solicitation. Id.

CHE appealed. On appeal, we determined not only that NAVO established a rational basis based on the supplemented record, but also that no supplementation was required in the first place. Id. at 1354 ("NAVO established a rational basis to combine hardware and software services into one contract before the trial court requested supplementation. The additions to the administrative record were thus not necessary."). In our decision, we pointed to several concerns about "segregating the maintenance contracts," which were stated in a memorandum and affidavit of NAVO's contracting officer representative, both of which were present in the original administrative record. Id. at 1354–55. We indicated that those concerns provided a rational basis for NAVO's procurement, even though the documents provided no supporting evidence for the concerns expressed. Id. at 1355. Affirming the decision of the Court of Federal Claims based upon the original administrative record, we stated:

> NAVO has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review. . . . Indeed NAVO has a responsibility to assess risks and avoid them before they become a historical fact. . . . In terms of this procurement, NAVO need not suffer some maintenance failures in order to substantiate its assessment of risks . . . . Thus, to satisfy its obligation to supply a rational basis for its decisions, NAVO may supply a reasoned chronicle of its risk assessment, as it did in this case.

CHE Consulting, 552 F.3d at 1355.

CHE Consulting controls this case. The Corps has put forth seven specific reasons for its procurement action, each of which represents a legitimate procurement objective. And as seen, in the case of each reason, the Acquisition Plan states the underlying rationale. Perhaps the Plan's fullest statement of an underlying rationale relates to emergency procurements. In that regard, the Acquisition Plan states that "[t]he southeastern portion of the United States, simply from its geographic proximity to warm, tropical climatic conditions, is annually subjected to hurricanes and other potentially catastrophic natural disasters." Continuing, the Plan explains how "during the past several years," hurricanes and other severe storm events have increased shoaling in many channels, and it states that some shoaling became so severe that emergency contracts were required in order to maintain channel depths and allow access by both commercial and military vessels. The Acquisition Plan recites that many of these emergency contracts were solicited using less than full and open competition in accordance with FAR 6.302-2, Unusual and Compelling Urgency. See 48 C.F.R. § 6.302-2. The Acquisition Plan adds that, "[b]ased upon expert technical analysis, it is anticipated that this increase in shoaling will continue into the foreseeable future." It states in addition that storms during the 2004 hurricane season "devastated many miles of shoreline" in North and South Carolina and Florida. This damage, the Acquisition Plan notes, resulted in the award of twenty shore protection contracts with a total value of over $98 million. The Plan concludes the discussion by stating that implementation of the MATOC procurement scheme "would virtually eliminate the need to limit competition in the case of natural disaster or other national emergencies."

The Corps was required to "supply a reasoned chronicle of the risk assessment." CHE Consulting, 552 F.3d at 1455. We think it did that by stating the reasons for its procurement decision and the thinking behind those reasons. Put most simply, given the Corps's mission, and what the Acquisition Plan tells us, we conclude that the Corps has sufficiently demonstrated that it is working to "avoid [risks] before they become historical fact" and that it has supplied a "reasoned chronicle of its risk assessment."

In sum, we hold that the Corps's decision to issue the MATOC solicitation "evince[s] rational reasoning and consideration of relevant factors." Were we to conclude otherwise, we would be second-guessing the Corps's action. That is something we are not permitted to do. "'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)) (holding that the General Accounting Office's determination that a bid for a procurement contract was responsive and properly disclosed the bidder's identity had a rational basis). In this case, the Corps has demonstrated a rational basis for the MATOC solicitation.

VI.

As noted, the Court of Federal Claims ruled that the MATOC solicitation did not comply with the Corps's own procurement regulation, the EFARS. At the time the case was before the court, EFARS § 16.501, S-103(a), limited the circumstances in which indefinite delivery contracts could be used. The Court of Federal Claims held that the

government had failed to establish that any of the specified circumstances were met insofar as the MATOC solicitation was concerned.

On appeal, the government argues that the Court of Federal Claims erred in ruling that the MATOC solicitation violated the EFARS. Weeks rejoins that the court's ruling on the EFARS issue was correct. For two reasons, however, we conclude that it is not necessary for us to address the issue. First, as noted above, Weeks stated at oral argument that the case turns on the question of whether the Corps demonstrated a rational basis for its procurement action. We have held that it did. Second, on January 25, 2008, after entry of the Amended Final Judgment, the Corps rescinded EFARS § 16.501, S-103(a). Under these circumstances, even if we had not already ruled the Corps had a rational basis for its action, and we agreed with Weeks that the Corps failed to comply with the rescinded EFARS provision, our ruling would have no practical import, since the Corps is no longer bound by the provision.

## CONCLUSION

For the foregoing reasons, we reverse the Amended Final Judgment insofar as it permanently enjoins the Corps "from using Solicitation No. W 912EP-07-R-0007 to receive proposals or to award negotiated IDIQ contracts or task orders for maintenance dredging or shore protection services." Accordingly, the Corps is authorized to proceed with the solicitation. Neither the government nor Weeks has appealed the rulings of the Court of Federal Claims in the Amended Final Judgment with respect to the presolicitation notices issued by the Corps on November 7 and November 8, 2007. We therefore leave those rulings undisturbed. Thus, the Amended Final Judgment is affirmed-in-part and reversed-in-part.

<u>AFFIRMED-IN-PART</u> and <u>REVERSED-IN-PART</u>

COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

2008-5034

WEEKS MARINE, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 07-CV-700, Judge Thomas C. Wheeler.

DYK, Circuit Judge, dissenting.

I dissent from the majority's holding that Weeks Marine has Article III and statutory standing to challenge the solicitation of the U.S. Army Corps of Engineers ("Corps").

As described in the majority opinion, Weeks Marine filed a pre-award challenge to a solicitation by the Corps. The solicitation changed the Corps' method of awarding dredging work in the Southeast from a competitive sealed bidding process to a process involving negotiated indefinite delivery indefinite quantity ("IDIQ") multiple-award task order contracts ("MATOCs"). Weeks Marine alleged, inter alia, that the solicitation was contrary to 10 U.S.C. § 2304(a)(2), which requires the use of sealed bidding procedures under certain circumstances. Weeks Marine made no allegations of injury in its complaint and appears to have filed no affidavits or declarations providing a basis for a finding that the solicitation was likely to cause injury. In its memorandum supporting its

motions for injunctive and declaratory relief, Weeks Marine asserted it would be harmed by the "<u>potential</u> loss of valuable business . . . that it could otherwise obtain under the required sealed bidding procedures."  Mem. P. & A. Supp. Pl.'s Mot. for TRO, Prelim. Inj., Permanent Inj. & Declaratory J. at 28, <u>Weeks Marine, Inc. v. United States</u>, 79 Fed. Cl. 22 (Fed. Cl. 2007) (No. 07-700C) (emphasis added).  Weeks Marine did not allege that it was <u>actually</u> likely to be awarded less dredging work by the Corps under the solicitation.  Indeed, the majority goes to great pains to point out that Weeks Marine will continue to be included in the pool of prospective contractors.  <u>See</u> Maj. Op. 12.  At oral argument, Weeks Marine asserted that it had "thrived under the business model of sealed bidding and the low bidder" and "built [its] compan[y] . . . and marketing plan that way," argued that it would be less able "to control [its] own destiny" under the Corps' new procedure, but admitted that "we don't know" whether the new procedure would injure Weeks Marine.[1]  Weeks Marine was unable to identify any reason that it was

---

[1]

Q.  You may be just as successful in the future as you've been in the past. . . . It seems to me that it's really speculative to say that Weeks is going to be injured by this new approach to the contract.

A.  Well, we don't know, your Honor, but here's what we do know, you're absolutely correct that Weeks and other companies have thrived under the business model of sealed bidding and the low bidder, and—and they've built their companies and—and marketed, ah—their marketing plan that way. . . .

. . . .

Q.  Why is it less likely that Weeks is going to be successful under this new system?

A.  Because they can control their own destiny in having low bids with which they can make money.  They can't control their destiny when the Corps of Engineers is going to introduce subjective evaluations on things other than price.

Oral Arg. 18:00-18:31, 19:30-19:54.

likely to lose business as a result of the change in procedures, or how it was disadvantaged compared to other bidders.

I  Lack of Article III Standing

The government asserts that Weeks Marine lacks standing.  In any event, "[b]ecause Article III standing is jurisdictional, this court must consider the issue sua sponte even if not raised by the parties."  Fuji Photo Film Co. v. Int'l Trade Comm'n, 474 F.3d 1281, 1289 (Fed. Cir. 2007).

Article III standing requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (footnote, citations, and quotation marks omitted).  Put differently, "[t]he injury alleged must be . . . 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.'"  Allen v. Wright, 468 U.S. 737, 751 (1984) (citations omitted).  Injury can be established by affidavits and other submissions that "present dispositively more than . . . mere 'general averments' and 'conclusory allegations.'"  Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 184 (2000).

The Supreme Court has established the requirements for pre-contract award standing in Northeastern Florida Chapter of Associated General Contractors of America v. Jacksonville, 508 U.S. 656, 666 (1993), and Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210-12 (1995).  The Supreme Court held in Associated General Contractors that a non-minority contractor had standing to challenge a city's practice of setting aside a percentage of its contracts for bidding only by minority contractors, because "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not

the loss of a contract." 508 U.S. at 666. Following Associated General Contractors in Adarand, the Supreme Court held that a subcontractor had standing to raise an equal protection challenge to government financial incentives provided to general contractors hiring disadvantaged subcontractors. See Adarand, 515 U.S. at 210-12. The plaintiff subcontractor alleged that because it was not a disadvantaged subcontractor, it would suffer future competitive harm from this practice. The Court held that the subcontractor had satisfied the requirement that "the alleged injury is not too speculative for Article III purposes—that the injury is 'certainly impending'" because the record indicated that the subcontractor would "very likely" bid on future contracts subject to the government's practice and "often must compete for such contracts against small disadvantaged businesses." Id. at 211-12 (quoting Lujan, 504 U.S. at 565 n.2).

The record does not show that Weeks Marine is likely to be disadvantaged by the Corps' IDIQ MATOC solicitation. The Court of Federal Claims noted that Weeks Marine "admits that it is a 'major player in the dredging industry' and would likely be awarded an IDIQ contract and subsequent task orders." Weeks Marine v. United States, 79 Fed. Cl. 22, 34 (2007). Because Weeks Marine has not shown that it is likely to be awarded less dredging work under the MATOC system, its injury is "conjectural" rather than "impending."

The majority does not suggest that Weeks Marine is less likely to receive awards under the new procedure, or that it is likely to be injured by any reductions in the amount of business it receives. The majority's theory appears to be that the claimed illegality of the solicitation is itself sufficient to establish injury. However, the Supreme Court has made clear that the existence of illegal conduct is not sufficient to confer

standing. "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Allen, 468 U.S. at 754. There must be a showing of injury in addition to a showing of illegality to satisfy the requirements for standing, in order to "assure[] that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.'" Summers v. Earth Island Inst., 129 S. Ct. 1142, 1149 (2009) (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 221 (1974)).

The majority also suggests that Weeks Marine has established standing either with its past reliance on the previous sealed bidding procedure in establishing its business, or with its future reliance on the new IDIQ procedure that might later be overturned as illegal. See Maj. Op. 13, 16. According to the majority, regardless of Weeks Marine's level of success under the new solicitation procedure, such reliance may injure Weeks Marine's ability to compete for dredging contracts. But reliance, like alleged illegality, cannot establish standing without a showing of injury, and the majority cites no authority establishing that mere reliance without injury is sufficient.

The majority appears to bolster its decision on the theory that Weeks Marine would later be barred from challenging the new solicitation procedure. See Maj. Op. 18. There are two responses. First, if Weeks Marine were later injured by the solicitation, it would not in fact be barred from challenging the solicitation at that time. The theory that Weeks Marine's challenge to the Corps' MATOC solicitation would not be possible after the IDIQ contracts and task orders had been awarded is based on a misreading of the statutes and regulations. Section 1491(b)(1) of Title 28 of the United States Code specifically provides that challenges to solicitations may be brought "without regard to

whether suit is instituted before or after the contract is awarded." To be sure, 10 U.S.C. § 2304c(e)(1) provides that "[a] protest is not authorized in connection with the <u>issuance of a task order or delivery order</u> except for -- (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $10,000,000." (emphasis added); <u>see also</u> FAR ¶ 16.505(a)(9). But the statute does not limit protests of an overall solicitation or IDIQ contract; it only limits challenges to the task order or delivery order. Weeks Marine or another contractor thus could challenge the Corps' overall solicitation after, rather than only before, the IDIQ or task order awards.[2]

Second, standing is not created by the absence of parties with proper standing. "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." <u>Schlesinger v. Reservists Comm. to Stop the War</u>, 418 U.S. at 227. "This view would convert standing into a requirement that must be observed only when satisfied." <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 489 (1982); <u>see also</u> <u>United States v. Richardson</u>, 418 U.S. 166, 179 (1974). The fact that no party could satisfy the usual

---

[2]    Our holding in <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308 (Fed. Cir. 2007), is not to the contrary. In <u>Blue & Gold Fleet</u> the bidder waited until after the contract award to challenge a solicitation. We held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." <u>Id.</u> at 1313. Our opinion in <u>Blue & Gold Fleet</u> does not suggest that a contractor can challenge a procurement system before actually suffering or being likely to suffer an injury. <u>Blue & Gold Fleet</u> holds only that if the contractor is injured and has the "opportunity to object" to the solicitation, it cannot defer its challenge to a period after which the contract is awarded.

requirements for standing does not create standing in a party who has not suffered injury.

## II  Lack of Statutory Standing

As the majority recognizes, the applicable statute imposes even more stringent standing requirements.  See Maj. Op. 10-11.  Under the statute, the Court of Federal Claims has jurisdiction

> to render judgment on an action <u>by an interested party objecting to a solicitation</u> by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . <u>without regard to whether suit is instituted before or after the contract is awarded</u>.

28 U.S.C. § 1491(b)(1) (emphases added).  In <u>American Federation of Government Employees v. United States</u>, we reviewed at length the history of § 1491(b)(1) and concluded that Congress did not intend to confer standing under the more liberal standing rules of the Administrative Procedure Act, 5 U.S.C. § 702, but instead limited standing under § 1491(b)(1) to "disappointed bidders" and to prospective bidders whose chances of securing the award would be adversely affected.  258 F.3d 1294, 1302 (Fed. Cir. 2001).  We stated that  we "construe the term 'interested party' in § 1491(b)(1) in accordance with the [Competition in Contracting Act, 31 U.S.C. §§ 3551-56], and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose <u>direct economic interest</u> would be affected by the award of the contract or by failure to award the contract."  Id. at 1302 (emphasis added).

In the case of pre-award protests, we have repeatedly limited standing under § 1491 to those bidders who have a "substantial chance" of securing the award and who have been disadvantaged by the government procurement decision they challenge.  In

Rex Service Corp. v. United States, we held that a contractor did not have standing because it did not "establish that it had a 'substantial chance' of receiving the contract" and thus "prove a direct economic interest as a putative prospective bidder." 448 F.3d 1305, 1308 (Fed. Cir. 2006); see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996) (holding that a contractor failed to show a "substantial chance it would have received the contract award but for" agency error). In CACI Field Services, Inc. v. United States, we held that a contractor could not prevail in a pre-award bid protest without showing prejudice from an alleged violation of a procurement statute or regulation, because "prejudice is a separate element which must be proven." 854 F.2d 464, 466 (Fed. Cir. 1988); see also Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing.").

Weeks Marine here is not a "disappointed bidder," nor has it shown that its direct economic interests have been adversely affected. Indeed, for all the record reveals, Weeks Marine will continue to receive exactly the same contracts that it would have received under the earlier sealed bidding procedure. Allowing Weeks Marine to establish standing without a showing of concrete injury vastly and improperly expands the number of parties potentially qualifying for standing.

Under these circumstances, it seems to me clear that Weeks Marine does not have Article III or statutory standing, and I respectfully dissent from the majority's contrary conclusion.